1

2                    IN THE UNITED STATES DISTRICT COURT

3                     FOR THE DISTRICT OF PUERTO RICO

4                                -oOo-

5       THE UNITED STATES OF AMERICA,    )
                                         )
6              Plaintiff,                )   Case No. 3:21-CR-00161-PAD
                                         )
7       -vs-                             )
                                         )
8       FELIX VERDEJO-SANCHEZ,           )
                                         )
9              Defendant.                )
        _____)

10
                 TRANSCRIPT OF JURY TRIAL - DAY TWO - P.M. SESSION
11           HELD BEFORE THE HONORABLE PEDRO A. DELGADO-HERNANDEZ
                 UNITED STATES COURTHOUSE, HATO REY, PUERTO RICO
12                        WEDNESDAY, JUNE 21, 2023
        _____
13
                         A P P E A R A N C E S
14
        FOR THE UNITED STATES OF AMERICA:
15
        AUSA Jonathan L. Gottfried &
16      AUSA Jeanette M. Collazo-Ortiz

17      FOR THE DEFENDANT:

18      Jason Gonzalez-Delgado, Esq. &
        Gabriela Jose Cintron-Colon, Esq.
19
        COURT INTERPRETERS:
20
        Carlos Ravelo &
21      Lynmar Vera

22      GOVERNMENT INTERPRETER:

23      Jose Luis Rosado

24

25

```
 1                        I N D E X

 2   WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:        PAGE:

 3   KEILA ORTIZ-RIVERA

 4   Direct Examination by Ms. Collazo-Ortiz:              38

 5   Cross-Examination by Ms. Cintron-Colon:              74

 6   EXHIBITS:                                            PAGE:

 7   Government Exhibit No. 1                              37

 8   Government Exhibit No. 2                              37

 9   Government Exhibit No. 3                              37

10   Government Exhibit No. 4                              37

11   Government Exhibit No. 5                              37

12   Government Exhibit No. 6                              37

13   Government Exhibit No. 7                              37

14   Government Exhibit No. 8                              37

15   Government Exhibit No. 9                              37

16   Government Exhibit No. 10                             37

17   Government Exhibit No. 11                             37

18   Government Exhibit No. 12                             37

19   Government Exhibit No. 13                             45

20   Government Exhibit No. 95                             70

21   Government Exhibit No. 14                             73

22

23

24

25
```

1           (Proceedings commenced at 2:04 p.m.)

2                                -oOo-

3        (Whereupon the following proceedings were held in open

4         court without the presence of the jury.)

5                THE COURT:  I'm told there is a housekeeping matter.

6                MR. GONZALEZ-DELGADO:  Yes, Your Honor.

7                THE COURT:  Okay.  Please approach.

8           (Sidebar conference commenced.)

9                MR. GONZALEZ-DELGADO:  Your Honor, I'm looking at my

10       phone because I want to, I want to recite what happened, what's

11       been happening in court.  And I'm going to make a request.

12               There is a reporter here.  Her name is Sylvia

13       Hernandez.  Yesterday she did a live cast on radio, and it was

14       in Molusco News.

15               THE COURT:  In what?

16               MR. GONZALEZ-DELGADO:  In Mulusco News.  It's a

17       podcast, and it's a radio show from, I think it's 2:00 p.m. to

18       7:00 p.m., where she came out saying that Mr. Verdejo had

19       intimidated, was intimidating her in court.  And she stated,

20       it's -- let me look at it here.

21               My sister called me to say how could this have

22       happened, blah, blah, blah.  And I said that that was not true.

23               She, in her own blog -- and let me just clarify

24       something.  I have no problems with the press being here.

25               THE COURT:  Go ahead.  Go ahead.

1              MR. GONZALEZ-DELGADO:  I have no problems with

2     freedom of speech.  It's just that in Sylvia Hernandez's news

3     on Instagram, she made a publication yesterday that

4     Mr. Verdejo, that Mr. Verdejo had intimidated her while she

5     stood at the door.  And she looked in through the little glass

6     window, and Mr. Verdejo was allegedly speaking with us, and he

7     turned around; his face changed; and he got angry.

8              And the words -- this is -- my sister sent me this.

9     The words were in Spanish.  She said:  [Non-English language].

10    She looked -- not straight.  She looked -- [non-English

11    language] is -- she stared.  He stared directly into my eyes.

12    That would be the translation.

13             The problem with this is, this is sending out more

14    sentiment out to the public.  What I'm going to request from

15    the Court is -- since this incident, I spoke with Mr. Verdejo.

16    He says that he doesn't even know who she is.

17             He never did this.  Yesterday, while this was

18    supposedly happening, the marshals were right behind him.  We

19    were talking to him.  And this happened right at the door.

20             What I'd request --

21             MS. CINTRON-COLON:  The further request, I think it's

22    important to also note that, because it's part of the request,

23    that today, since the press has been allowed into the

24    courtroom, per se, she's been staring at Mr. Verdejo.  And then

25    every time he looks at us, she's trying to get a reaction or an

1    emotional response from him, which we believe is even more

2    prejudicial because she is literally trying to get a negative

3    response from him.

4              MR. GONZALEZ-DELGADO:  And the only thing that I'm

5    going to ask, Your Honor, is that, that she be allowed to be in

6    court.  I have no problem.  But she either stay at the press

7    room or she move to the other courtroom that the Court had,

8    Number 5, just to avoid any type of incidents.

9              When we walk out, I walk out with Mr. Verdejo's

10   family members.  She's one that she doesn't let us walk out.

11   She puts -- shoves microphones in our faces.  We have to tell

12   her:  You need to move; we have to get out of here.  And it's

13   just that she's being too adamant in her job.

14             All I want, Your Honor, I don't want any incidents

15   with Mr. Verdejo's family and her because we are in a

16   disadvantage.  She's the one who's got access to the press.  We

17   do not.  And the press will not show what she's actually doing.

18             And second of all, that she has the right to be here.

19   It's a public trial.  Mr. Verdejo doesn't want this closed or

20   anything.  It's just that she not be in this courtroom, and

21   that she report to the press room, where she can see exactly

22   what's happening without having any type of disagreement or

23   interaction with Mr. Verdejo.

24             MS. CINTRON-COLON:  Or eliciting any contact of any

25   type whatsoever.

1          THE COURT:  I cannot do that.  She is a member of the
2     public.  She's entitled to be here in the courtroom.  We no
3     longer have Number 5 for overflow.
4          I understand your point.  In an ideal world, it
5     should not be occurring.  But I do not know what I can do
6     without prejudicing your client.
7          While you were speaking, I thought:  Well, maybe Mr.
8     Gonzalez should say all this in open court.  I'm not sure that
9     would be of help to what you want to accomplish to avoid this
10    type of situation.
11         MR. GONZALEZ-DELGADO:  That's exactly what we want to
12    do, avoid it.
13         THE COURT:  I understand.  But there are unintended
14    consequences, particularly, as you said, when you are not
15    talking to the press.  So let me see what, what goes to malign,
16    other than what I just said.
17         MR. GONZALEZ-DELGADO:  We, we, we thought that we
18    needed to put this on the record because Mr. Verdejo, he has
19    enough anxiety as it is of being the defendant in this case.
20    The other witnesses are also here.  And having this, this
21    reporter putting a little more anxiety on him without any need,
22    we just want to avoid a situation that may cause a rift with
23    the jury or they may see Mr. Verdejo maybe react to something,
24    and they might misinterpret it.
25         We have spoken with Mr. Verdejo.  He doesn't look

1    back.  And anything that happens, he's been ordered to inform

2    us.

3              But I, I will follow the Court's order.  It's just

4    that I think this needed to be put on the record to avoid

5    another situation, Your Honor.

6              THE COURT:  It's part of the record.

7              MR. GONZALEZ-DELGADO:  Thank you.

8              THE COURT:  Okay.  Thank you.

9              Anything else?

10             MR. GOTTFRIED:  Nothing else.

11             MS. CINTRON-COLON:  Not for now.

12         (Sidebar conference concluded.)

13             THE COURT:  Everything set to call the jury in?

14             MS. COLLAZO-ORTIZ:  Yes, Your Honor.

15             THE COURT:  Mr. Gonzalez?

16             MR. GONZALEZ-DELGADO:  Yes, sir.

17             THE COURT:  Everything looks okay to call the jury

18    in?

19             MR. GONZALEZ-DELGADO:  Yes, sir.

20             THE COURT:  All right.  How about systems, are all

21    systems go?

22             Yes.  Okay.

23             The courtroom is open to the public.  Let's call the

24    jury in.

25             (Whereupon the following proceedings were had in open court

```
 1          in the presence of the jury.)
 2              THE COURT:  Welcome back to the courtroom.  Please
 3     take a seat.
 4              Opening statement.
 5              MS. COLLAZO-ORTIZ:  Good afternoon.
 6              May it please the Court?
 7              THE COURT:  Go ahead.
 8              MS. COLLAZO-ORTIZ:  Good afternoon, members of the
 9     jury.  I am AUSA Jeanette Collazo.  I'm here with my colleague,
10     AUSA Jonathan Gottfried.  And we represent the United States in
11     this case.
12              Felix Verdejo-Sanchez and Keishla Rodriguez-Ortiz
13     were in a relationship for over 10 years, starting as
14     teenagers.  Felix was a rising star in boxing.  He would travel
15     the world to train and fight.
16              Keishla was a girl who loved animals.  She tried to
17     make a humble living by working as a pet-groomer.  Verdejo's
18     sexual relationship with Keishla continued since they were
19     teenagers and even after he got together with Ms. Eliz
20     Santiago, it continued after he started living with Ms. Eliz
21     Santiago and even after the two of them had a child together.
22              Eliz was regarded by everyone as Verdejo's wife, even
23     though they never married, but she was the woman he would take
24     out in public.  For Verdejo, Keishla was just the girl from the
25     projects, from el caserio, who was good enough to have sex
```

1    with, but nothing more.

2         Keishla, in love with Verdejo, got a tattoo on her

3    back of a "diamante" because Mr. Verdejo is known as "El

4    Diamante."  Verdejo wasn't honest in his relationships and made

5    fun of the woman who loved him.

6         His nickname for Eliz, who was regarded as his wife,

7    in his phone, was "my suffering wife."  Meanwhile, Verdejo

8    would call Keishla a dumb bitch and a slut.

9         He made hollow promises.  To Eliz, he kept promising

10   to change and stop his infidelities.  Both women seemingly

11   accepted this machismo.  Eliz knew about Verdejo's

12   infidelities, and to a point, she tolerated them.

13        But on April 26th, 2021, Eliz again discovered

14   evidence of Verdejo's infidelities.  She wanted to break things

15   up.  He was again seeking forgiveness, making promises to

16   change and showering her with gifts.

17        He couldn't understand why now Eliz would want to

18   break up over his infidelities, but she seemed serious this

19   time.  He was desperate.  And then he learned it was worse, way

20   worse.

21        On April 27th, 2021, Keishla told him she was

22   pregnant.  And so he learned that he had really messed up,

23   [non-English language].  For Keishla, this pregnancy was joyful

24   news.  For Verdejo, it was the worst possible moment.

25        His relationship with Eliz was suffering, and he was

1    trying to restart his boxing career.  He wasn't going to get --
2    he wasn't going to let a girl from el caserio get in the middle
3    of that.  He was thinking of his next flight -- I'm sorry, his
4    next fight.  He wanted to conquer the world again.

5            But a new baby with a poor girl from Villa Esperanza
6    was a nuisance.  He had an image.  He had sponsorships that he
7    needed to protect.

8            A baby with Keishla also interfered in his rocky
9    relationship with Eliz.  She may not have been the only woman
10    he was having sex with, but at that point, she was the only
11    woman he had a child with.  Accepting a child from another
12    woman was too much to ask from Eliz or too much to expect.

13            So upon learning the news of Keishla's pregnancy,
14    Verdejo's first reaction was to ask her not to have her, not to
15    have the baby, to get an abortion, to convince her to have an
16    abortion.  But that did not work because Keishla wanted a baby.

17            When she learned she was pregnant, she joyfully
18    shared that news with some of the people closest to her.  The
19    family started making plans to welcome the baby into the
20    family.  So when Verdejo's attempt to convince her failed, he
21    took a terrible decision, the decision that brings us here
22    today.

23            He hatched a desperate plan to get rid of Keishla and
24    her baby.  One of the first things he did as part of that plan
25    was to stop talking to her on his regular phone, so he started

1    using a second phone to talk to her, a prepaid phone.  But

2    there were several holes in his plan.

3            First, he failed to account for one important thing:

4    a mother's intuition.  On the morning of April 29th, 2021,

5    Keishla told her mother that she had made plans to meet Verdejo

6    that morning.  Later, when Keishla did not show up to work and

7    did not answer the phone, her mother knew there was something

8    wrong, and her first reaction was to call Verdejo because

9    Keishla had made plans to see him that morning.

10           But when the mother didn't get a satisfactory answer

11   from Verdejo, she hopped on a plane from Orlando to San Juan,

12   desperate to find her daughter.  The evidence would later

13   corroborate her worst fears.

14           Verdejo's plan also failed to consider that his

15   registered phone, the one he wasn't using anymore to talk to

16   Keishla, was still leaving behind a clear trail of his

17   movements that morning from his house, where he lived with

18   Eliz, to training at Parque Central, to picking up his

19   accomplice at Luis Llorens Torres, to driving down the highway

20   to the victim's home in Villa Esperanza, and then bringing her

21   to Teodoro Moscoso Bridge, where he tossed her.

22           Likewise, as family and friends kept trying to reach

23   Keishla, her phone was also connecting to the same towers in

24   the same areas as Verdejo's phone.  Verdejo also failed to

25   consider that his accomplice would soon give him up.

1              Over the course of this trial, you will hear from
2      several witnesses.  One of those witnesses is going to be
3      Ricardo Cadiz-Martinez, a friend of Felix Verdejo.  Ricardo
4      will testify that Verdejo approached him on April 27th, 2021,
5      and asked for help to abort a baby.  But when Verdejo told him
6      that the woman was not willing to have an abortion, Ricardo
7      refused to help him.
8              Verdejo was desperate so he turned to Ricardo's
9      brother, Luis, who he knew had been in prison, and asked for
10     his help.  Luis agreed to help him, and the sequence of events
11     that would end in the death of Keishla and her unborn child was
12     set in motion.
13             Luis Cadiz will also testify here.  And from his
14     testimony, you will learn that Verdejo first approached him a
15     couple of days before the murder.  Verdejo was desperate and
16     made it clear to him that their plan was not only to have an
17     abortion, but that they needed to make Keishla disappear.
18             On April 28th, Verdejo, using the prepaid phone that
19     he was now using to communicate with Keishla, called the victim
20     and set up a meeting for the next morning, April 29, 2021.  The
21     morning of April 29th, Verdejo went to the Llorens Torres
22     Public Housing Project and picked up Luis Cadiz-Martinez in his
23     black Dodge Durango.
24             Verdejo and Luis Cadiz went to Villa Esperanza Public
25     Housing Project, where the victim resided.  They rode in

 1    Verdejo's black Dodge Durango.  Keishla was waiting outside el
 2    caserio in her, in her Kia vehicle.
 3        Felix Verdejo parked his SUV behind her, and Keishla
 4    got out of her own car and boarded the Durango SUV.  She was
 5    waiting to meet Verdejo to show him the pregnancy test.  So as
 6    soon as she got into the vehicle, she showed him the pregnancy
 7    test that she had gotten the day before from a laboratory.
 8        And then Cadiz grabbed Keishla's hair, while Verdejo
 9    punched her in the face and injected her with drugs.  They
10    moved the SUV to a prior location down the street where they
11    parked for several minutes while they continued to tie her up
12    with metal wire, and they attached a cement block.
13        Then Verdejo drove the Durango back to where the Kia
14    vehicle had been parked.  Luis Cadiz got out and boarded
15    Keishla's car.  Then he drove behind Felix Verdejo, who drove
16    the Durango with Keishla tied in the back.
17        They drove to a second location where they parked
18    Keishla's Kia, and then Luis Cadiz boarded the Dodge Durango.
19    Keishla was still in the backseat tied to the cement block.
20    And then they headed toward the Teodoro Moscoso Bridge.
21        At the bridge, they parked on the shoulder in el
22    paseo for a while, several minutes.  The video shows that they
23    were there several minutes.  And this is in broad daylight,
24    approximately between 8:00 and 9:00 a.m.
25        During this time, Verdejo and Luis Cadiz tossed

1    Keishla off the side of the bridge while she was tied up with

2    metal wire at her hands, legs, waist, and tied to a cement

3    block.  But Keishla did not completely sink, as Verdejo

4    expected.  In fact, investigators would later learn that the

5    water beneath the bridge is actually pretty shallow.

6         So Verdejo, desperate to finish what he started, took

7    out his brown firearm, handed it to Luis Cadiz and ordered him

8    to shoot at Keishla.  Cadiz fired some shots at the water, and

9    then they left the bridge, crossing the toll for the first time

10   that morning.

11        They did a loop and then came back to the bridge to

12   check if she had sunk or not.  But she still hadn't sunk.  So

13   Verdejo, desperate to save his family and his career, jumped in

14   the water to finish her off.  Verdejo dragged Keishla

15   underneath the bridge while Luis Cadiz looked over from the

16   bridge.

17        After some time, when Verdejo did not come back out,

18   Cadiz drove off in the Dodge Durango and went through the toll

19   for the second time that morning.  He did another loop before

20   getting back onto the bridge to look for Verdejo, who had

21   jumped into the water.

22        Cadiz looked over the side of the bridge and into the

23   water, but could not find Verdejo.  So after a few minutes, he

24   crossed the toll for the third time that morning and again made

25   his way back towards the bridge to keep looking for Verdejo.

1     But before Cadiz could get back on the bridge for the fourth

2     time, he saw Verdejo on the side of Baldorioty Avenue near the

3     exit to the bridge.

4            So Cadiz picked up Verdejo, and they headed to Punta

5     Las Marias, to the beach near Isla Verde, where they would

6     dispose of Keishla's phone and Verdejo's prepaid phone.  Then

7     they returned to Luis Llorens Torres Public Housing Project

8     where the accomplice, Mr. Luis Cadiz, lived.

9            After they were there, Verdejo took Mr. Cadiz to

10    where they had left Keishla's vehicle, and he asked Cadiz to

11    burn the vehicle.  But Cadiz didn't burn them, didn't burn the

12    vehicle.  Instead, he moved it to another location in

13    Canovanas, where the police would eventually find it.

14           Verdejo's awful murder would not remain hidden for

15    long.  Keishla's mother and other family members were anxious

16    to find her.  And Luis Cadiz-Martinez would soon confess the

17    details of their crime.

18           Shortly thereafter, on May 1st, the police would find

19    Keishla's body in the San Jose Lagoon wrapped in metal wire,

20    tied at the hands, the feet, and the waist, to a cement block.

21    Luis Cadiz's testimony will allow you to understand how this

22    senseless crime came about, how it was planned and how it was

23    executed.

24           We present Luis Cadiz's testimony to you aware that

25    he's just as culpable as Mr. Verdejo.  He's not saying he is a

1    criminal, but crimes are committed and witnessed by criminals.

2    We ask you to listen, to consider his testimony together with

3    the rest of the evidence.  You will find that his testimony is

4    thoroughly corroborated by independent --

5            MR. GONZALEZ-DELGADO:  Objection, Your Honor.

6            THE COURT:  Overruled.

7            MS. COLLAZO-ORTIZ:  You will find that his testimony

8    is thoroughly corroborated by --

9            MR. GONZALEZ-DELGADO:  Objection, Your Honor.  May we

10   approach?

11       (Sidebar conference commenced.)

12           MR. GONZALEZ-DELGADO:  Your Honor, we have an

13   objection as to that statement in the sense that it is improper

14   vouching, and the First Circuit Court of Appeals, opening and

15   closing statements, says that the prosecutor, any

16   representation as to the prosecutor's personal belief in the

17   guilt of the accused is improper.

18           "We're not trying to prosecute anyone."  That's *U.S.*

19   *versus Adams,* 305 F.3d 30, 37, First Circuit, at 202.

20           But the government cannot improperly vouch for the

21   witness.  They could have said that he will testify.  And the,

22   the jury is the one who will decide if it's corroborated.

23           It's not that it will thoroughly corroborate the

24   evidence -- no -- be corroborated by the evidence.  I'm

25   objecting to that line, Your Honor, in opening statements.

```
 1              Vouching, in the cases -- I'm sorry, Your Honor.  I
 2    interrupted.
 3              Vouching for the credibility of a witness, in 2015,
 4    the First Circuit summarized it's improper vouching precedence
 5    in U.S. versus Vazquez-Larrauri, 778 F.3d 276 at 284.  It's a
 6    First Circuit case in 2015.
 7              Several forms of credibility argument plainly cross
 8    over into improper vouching.  That's U.S. versus Rojas, 758
 9    F.3d 61 at 64, First Circuit, 2014 case.
10              MS. COLLAZO-ORTIZ:  I'm not vouching for the
11    credibility of the witness.  To the contrary, I said that is
12    for the jury to consider his testimony in light of all the
13    other evidence and the corroborating evidence that we're going
14    to present, Your Honor, talking about the evidence.
15              MR. GOTTFRIED:  And, Your Honor, if I may, I think if
16    the prosecutor were allowed to finish the sentence, it was
17    going to be corroborated by, and list specific pieces of
18    evidence that were going to be presented to the jury that are
19    consistent with the cooperator's testimony.  So it's not a
20    personal opinion.  What she would state is that this evidence
21    that we presented corroborates.
22              THE COURT:  Objection overruled.  Go to the court
23    reporter's screen where specifically you were when the
24    objection came in so that you can take it from there.
25              MS. COLLAZO-ORTIZ:  Thank you, Your Honor.
```

Cindy Lee Brown, RPR, Official Court Reporter
U.S. District Court, District of Puerto Rico
(787) 772-3478

1          (Sidebar conference concluded.)

2          MS. COLLAZO-ORTIZ:  As I was saying, you will find

3    that the testimony is corroborated by independent evidence,

4    which includes, among others, AutoExpreso records, surveillance

5    videos, the content of Mr. Verdejo's phone, cellular phone

6    records, including location data from those phones, and the

7    results of Ms. Keishla Rodriguez's autopsy.

8          Also, it should be noted that Mr. Cadiz-Martinez did

9    not know Keishla.  He had never met her.  He did not know where

10   she lived, did not know what car she drove.  He had no reason

11   to hurt her or to hurt her baby.  He is accused in this court,

12   and before you in this trial, because Felix Verdejo, the person

13   who had a motive to hurt Keishla, asked for his help.

14         Regarding his testimony, I have to tell you that at

15   first, and perhaps understandably, he minimized his own

16   participation.  But he later corroborated -- I'm sorry,

17   corrected those statements.

18         More importantly, you will see that none of those

19   corrections go to the heart of the case.  These are details

20   that don't affect his culpability or Verdejo's culpability.

21   We're talking about details such as where they parked Keishla's

22   car while they were at the bridge tossing her, or who prepared

23   the syringe with the drugs that Mr. Verdejo injected Keishla

24   with.  As I said, those are collateral details that don't go to

25   either of their culpability.

1              Luis Cadiz-Martinez has already admitted his guilt.

2      His only option now is to tell the truth and help bring about

3      justice for --

4              MR. GONZALEZ-DELGADO:  Objection, Your Honor.

5              THE COURT:  Overruled.

6              MS. COLLAZO-ORTIZ:  -- and help bring about justice

7      for his victims.

8              In this case, there is no magic piece of DNA

9      evidence.  And while there is plenty of video footage, the

10     cameras were located at significant distances from the events.

11     Nonetheless, in combination with all the other evidence, they

12     corroborate the details of how Mr. Verdejo murdered Keishla and

13     her unborn child.

14             Luis Cadiz-Martinez will explain to you the events

15     leading to Keishla's murder.  The videos will illustrate and

16     thoroughly corroborate his testimony, including the routes they

17     took, the calls that were made, and the manner in which they

18     ended Keishla's life and that of her unborn child.

19             The videos, while taken from a distance, corroborate

20     Cadiz's testimony.  They show the Kia and the Durango in front

21     of Villa Esperanza, and immediately after the Durango arrived,

22     the driver of the Kia gets out and walks towards the Durango.

23             They also show the Durango parked at a secondary

24     location for several minutes, and they show the Durango

25     returning to the Kia, where the passenger gets out and boards

1    the Kia and then starts following the Durango.  The videos also

2    show the Durango at the bridge for an extended period of time

3    during which --

4              MR. GONZALEZ-DELGADO:  Your Honor, we have an

5    objection, and we need to approach.

6         (Sidebar conference commenced.)

7              MR. GONZALEZ-DELGADO:  Under the First Circuit's

8    opening and closing statements January 2023 update, the -- I

9    think I just moved it -- the government cannot elicit evidence

10   that has not been introduced into evidence in court.

11   Indicating that information not presented to the jury supports

12   the witness's testimony is improper.

13             *United States versus Auch*, 187 F.3d 125 at 131, it's

14   a First Circuit 1999 case.  It says improper vouching -- I'm

15   sorry.  And *United States versus Grant*, 971 F.2d 799 at 811, in

16   Note 22, First Circuit Case 1992, en banc.  Improper vouching

17   occurs where the prosecutor implicitly vouches for the

18   witness's veracity by indicating that information not presented

19   to the jury supports the testimony.

20             But the one that I'm referring to is that the videos

21   have not been admitted into evidence.  The First Circuit has

22   already stated that they cannot, they cannot vouch.  That the

23   government may not vouch.  That the evidence corroborates,

24   evidence not admitted corroborates the witness's testimony.

25   That part of the statement is what I'm objecting to, Your

1    Honor.

2              MS. COLLAZO-ORTIZ:  Your Honor, I was proffering what

3    the videos are going to show, which are evidence that will be

4    admitted at trial.  If I cannot comment on the evidence that

5    will be presented at trial, then there is no point of making an

6    opening statement.

7              Of course, this is evidence we know is going to be

8    introduced.  We have had in-limine motions about it.  We're not

9    vouching.  We are describing the contents of the documentary

10   and video evidence that we're going to be introducing.

11             THE COURT:  Objection overruled.

12             MR. GONZALEZ-DELGADO:  The fact that the evidence has

13   been requested in a motion in limine does not make that

14   evidence admissible.  The government has a burden.  They have

15   to meet that burden.

16             They have to present the witnesses to be able to have

17   the Court make the decision in trial if that evidence is

18   admissible or not.  If we litigated it prior to this, it's just

19   to avoid certain issues that would arise.  But they still have

20   the burden.

21             What I'm objecting is that they cannot tag the

22   evidence not admitted into evidence as corroborative to the

23   testimony of a witness who hasn't testified in court yet also.

24             THE COURT:  Objection overruled.

25        (Sidebar conference concluded.)

```
 1              MS. COLLAZO-ORTIZ:  So I was talking about video.
 2     And so I was explaining how the video shows a Durango, the
 3     Durango vehicle that we've been talking about, returning to, to
 4     the bridge.  And they stopped there for several minutes.  They
 5     pass the toll for the first time, and then returns twice.
 6              The second and third time, as I mentioned before, is
 7     where Mr. Luis Cadiz was trying to look down and see if Mr.
 8     Verdejo was coming back out from the water.  You will be able
 9     to, to see that on the video as well.  And the video also shows
10     them parking near Isla Verde Avenue, where the prepaid phone
11     that was being used by Mr. Verdejo, as well as the victim's
12     phone, were destroyed and tossed into the water.
13              But the evidence is not limited to Mr. Cadiz's
14     testimony or the videos that I have mentioned.  Witnesses will
15     testify that Mr. Verdejo did not want Keishla to have her
16     child; that he wanted her to have an abortion.
17              Witnesses will explain that Keishla's plan that day
18     was to meet Verdejo before work.  AutoExpreso records placed
19     Mr. Verdejo's Dodge Durango on the bridge the morning of the
20     murder and corroborated passing the toll booth three times
21     during a short period of time.
22              Witnesses will explain that Verdejo admitted having
23     plans to meet Keishla that morning of April 29th.  Witnesses
24     will explain that Mr. Verdejo admitted passing through the
25     bridge that morning.
```

1          Location information for the phones used by Verdejo,
2     the victim, and Mr. Cadiz, also corroborate Cadiz's account.
3     Phone location records traced Mr. Verdejo's movements that
4     morning of April 29th from his house to training at Parque
5     Central to Llorens Torres, where he picked up his accomplice,
6     to Keishla's residence at Villa Esperanza to the Teodoro
7     Moscoso Bridge and then to Isla Verde.
8          Although Verdejo deleted messages on his phone,
9     specifically messages with Keishla and with Mr. Cadiz, those
10    messages were recovered, and they will be presented to you.
11    The movements of Verdejo's and Keishla's phone also corroborate
12    the testimony.
13         The crime scene autopsies also are in accord with Mr.
14    Cadiz's account.  The pathologist who performed the autopsy
15    will explain that Keishla was, in fact, hit, drugged, and tied
16    up, while she was still alive.
17         Moreover, she was breathing when she was thrown in
18    the water tied to a cement block.  Keishla and her unborn child
19    died as a result.  With Mr. Cadiz's help, the defendant, Mr.
20    Felix Verdejo, punched and drug Keishla, rendering her
21    defenseless.
22         Inside his SUV and in front of the public housing
23    project where she resided, Felix Verdejo tied Keishla's hands
24    with a metal wire.  Cadiz helped him and tied her feet.  Then
25    they took her car with the intent to kill her.  That's the

1    carjacking.

2         Then they took her to the bridge.  That's the
3    kidnapping.  And they tossed her into the water.  Drugged and
4    tied, she would inevitably drown.

5         But Verdejo could not take any chances.  He wanted to
6    finish her off.  So when she did not sink, he had Cadiz shoot
7    at her.  That's the possession of a firearm in connection and
8    in relation to a violent crime.

9         When this also did not work, Verdejo desperately
10   jumped into the water to finish her off.  In the water, Verdejo
11   made sure his plan was complete.  Verdejo killed Keishla
12   Rodriguez-Ortiz and her unborn child that resulted in death
13   elements of the offense and the death of the unborn child.

14        At the end of this trial, after we have presented to
15   you the evidence, we will come back before you and request a
16   guilty verdict.  Thank you.

17        MR. GONZALEZ-DELGADO:  If I may, Your Honor?  May it
18   please the Court?

19        THE COURT:  Go ahead.

20        MR. GONZALEZ-DELGADO:  Thank you.

21        Good afternoon.  There is one thing that everybody in
22   Puerto Rico is in agreement:  This was a tragedy.  This is a
23   young woman who tragically died, and she was pregnant.

24        But there is a difference.  Sister Counsel just said,
25   her last words were, of an unborn child.  It gives out a false

```
 1    impression.  She was pregnant three weeks.  You are going to
 2    have the opportunity --
 3              MR. GOTTFRIED:  May we approach, Judge?
 4         (Sidebar conference commenced.)
 5              MR. GOTTFRIED:  Your Honor, the three weeks number
 6    is, as far as we know, speculation.  We don't have evidence
 7    regarding specific amount of time that she was pregnant.  So --
 8              MR. GONZALEZ-DELGADO:  We have documents that say it
 9    was a three-week pregnancy, and that's what Keishla told her
10    mother.  I mean, Keishla told Keila.
11              And those documents were provided by you.  That's
12    where I get my three weeks.
13              MS. COLLAZO-ORTIZ:  The evidence talks about the
14    first trimester, not three weeks.
15              MR. GONZALEZ-DELGADO:  Your Honor, I can proffer to
16    the Court in good faith that I read three weeks from the
17    evidence that the government provided.
18              MR. GOTTFRIED:  From what evidence?  You have a
19    good-faith basis to believe that that evidence is going to come
20    out?
21              MR. GONZALEZ-DELGADO:  Yes.
22              MR. GOTTFRIED:  I don't have a witness that I
23    understand is going to say --
24              MR. GONZALEZ-DELGADO:  You do have a witness.  We can
25    bring it out with Keila.  We can bring it out with Bereliz.
```

1    There are people who have knowledge of this.  And that was in

2    their statements, in the FBI 302s, in the Police of Puerto Rico

3    notes.

4             THE COURT:  Well, I'm in no position to make a ruling

5    with respect to whether we are talking about three weeks or the

6    first trimester.  But you are putting that in front of the

7    jury.  It's your call.

8             MR. GONZALEZ-DELGADO:  It's my call.  Yes, sir.

9             THE COURT:  Objection overruled.

10            MR. GOTTFRIED:  Yes, Your Honor.

11        (Sidebar conference concluded.)

12            MR. GONZALEZ-DELGADO:  If I may, Your Honor?

13            THE COURT:  Go ahead.

14            MR. GONZALEZ-DELGADO:  Thank you.

15            The government stated that this was a case in which

16    Mr. Verdejo did not want a girl from el caserio to have her kid

17    -- to have his kid.  But guess what?  His wife, Eliz, she's

18    from Manuel A. Perez.  Verdejo's from a caserio.  Keishla's

19    from a caserio.  That's something you have to consider.

20            There's no reason for Mr. Verdejo to kill Keishla.

21    The evidence will prove that.  The only person that you will

22    actually hear here say what happened that day is the actual

23    murderer.  He's going to sit there, and he's going to give you

24    what he believes, or what he says that day are the facts of

25    what happened that day.

1          The evidence that the government is going to provide,

2     or try to provide during the trial, will not corroborate any

3     participation by Mr. Verdejo.  It will provide evidence to

4     corroborate that Mr. Luis Cadiz was the one who did this, and

5     that evidence will prove everything that he says he did.

6          You will see, at the end of the trial, that the only

7     thing that Mr. Verdejo had for Keishla was love, and what

8     Keishla had for him was love.  For 10 years, they cannot keep

9     away from each other.  And that's evidence that you will listen

10    to.

11         What I'm going to ask you is that, at the end of the

12    trial, after having seen some disturbing pictures, videos,

13    testimony, that you can actually separate emotions from the

14    fact.  And because of the facts of the case, I ask you to bring

15    a "plea" of not guilty to Mr. Felix Verdejo.  Thank you.

16         THE COURT:  Thank you.

17         MR. GOTTFRIED:  Your Honor, before calling our first

18    witness we would like to move into evidence the following:

19         There are four phone records that we're moving to

20    admit under Rule of Evidence 902(11) and 902(13), as well as

21    pursuant to the Court's order at Document Number 581.  That is

22    Exhibit Number 1, T-Mobile record for (787)485-6855; Exhibit 2,

23    T-Mobile record for (787)963-3693; Exhibit 3, AT & T record for

24    (787)340-7865; and Number 4, AT & T record for (787)397-2408.

25         We would move that those items be admitted into

1    evidence under 902(11) and (13).

2              MR. GONZALEZ-DELGADO:  Your Honor, these -- this

3    request had been previously litigated.  We would request a

4    sidebar.  We have objections to three of the government

5    identifications that they intend to have introduced into

6    evidence.

7         (Sidebar conference commenced.)

8              MS. CINTRON-COLON:  So first is Government's ID

9    Number 3.

10             THE COURT:  ID what?

11             MS. CINTRON-COLON:  ID Number 3.

12             MR. GONZALEZ-DELGADO:  The Court has it.

13             MS. CINTRON-COLON:  Well, first, Your Honor, we --

14   I'm trying to not be in the way.  We're moving to not have this

15   record -- so it's, Government's ID Number 3 is actually a phone

16   records for a telephone number, area code (787)340-7865, and

17   the government has attributed it, this phone number, to Mr.

18   Verdejo unilaterally without any corroboration.

19             So our request that we have proposed to the Court,

20   and there was made a ruling, but we need to renew our

21   objection, is that, first of all, it's irrelevant because there

22   is nothing that says that this phone number is, in fact,

23   belongs to Mr. Verdejo.  In fact, the exhibit, the ID itself,

24   does not even mention Mr. Verdejo anywhere.

25             It's actually registered to some company that we have

1    no relation, correlation or direct -- I think the Court has it

2    right here -- or no direct relation to Mr. Verdejo or the facts

3    of this case at all.  Therefore, we move to exclude it under

4    401, and also under 403, because it would certainly be unfairly

5    prejudicial, confuse the issues and mislead the jury to believe

6    that this phone is, in fact, Mr. Verdejo's, and that it can be

7    admitted this way, when there is actually no corroboration or

8    information that actually states, and reliability, that states

9    that these records are, in fact, from Mr. Verdejo's, when

10   actually his name, address or any identifier is anywhere near

11   the documents that the government seeks to admit as ID Number

12   3.

13            That would be our objection.

14            MR. GOTTFRIED:  Your Honor, we have provided a CAST

15   report, which was submitted to the Court and provided to

16   defense counsel, providing the connection between this burner

17   phone and Verdejo's registered phone, namely the fact that they

18   were collocated over multiple points of time in April 2021.

19   In addition, the phone number that this, this phone record, as

20   well as Verdejo's registered phone number had in common, was

21   Keishla's number.

22            So we think that there is ample evidence that will be

23   introduced making this -- showing the relevance of this, of

24   this record.

25            MS. COLLAZO-ORTIZ:  Additionally, if we can add, this

1    number was the last number to communicate with the victim

2    before her disappearance.

3         MR. GONZALEZ-DELGADO:  Your Honor, proximity does not

4    mean ownership.  And just because it was the last number that

5    was called, somebody could have called Keishla at her phone

6    from that number.  But the government has no way of proving

7    that this phone actually belonged to or that Mr. Verdejo made a

8    phone call with that number.

9         All they're doing is, because there is a CAST, there

10   is a CAST report that says that this tower picked up these two

11   phone numbers in this area, and it's 120-degree area from the

12   local tower that the phone pinged, and that's their coverage.

13   They're trying to make an inference that just because they're

14   in that radius, which could be from 100 meters to three miles,

15   those phones, just because they were in that area, they belong

16   to Mr. Verdejo.

17        MS. CINTRON-COLON:  And regardless, what we're

18   talking about right now, Judge, is the admissibility of the

19   phone records.  And the personal register information, not the

20   CAST records reports, per se, which will be an issue probably

21   later in the trial, but right now we're talking about these

22   records by themselves that have no connection to Mr. Verdejo

23   whatsoever, without anything within those records, nor with the

24   personal user information in this exhibit in particular, Your

25   Honor.

 1              THE COURT:  Objection overruled.

 2              Which one is next?

 3              MS. CINTRON-COLON:  Our next objection is to

 4      Government's ID Number 10.

 5              Your Honor -- I'll wait.

 6              Again, Your Honor, our objection is mainly under 401,

 7      and also for lack of reliability, but mainly for 401, Judge,

 8      because there is only one name in this entirely seven pages

 9      heavily redacted that only says a name.  That it has no

10      relation to Mr. Verdejo, to the allegations in the Indictment,

11      or anything else in this case.

12              There is no reliability either on this document as it

13      being a business record, as it does not even show the company.

14      It doesn't have a signature.  It doesn't have a person who

15      prepared it, how it's recorded.  There is no certification to

16      that effect.  And that's not marked in ID Number 10.

17              MR. GOTTFRIED:  It's a certification because it would

18      be a confrontation clause issue if it was provided to you a

19      month ago.

20              MS. CINTRON-COLON:  But the ID Number 10

21      specifically, which was what we're trying to admit, doesn't

22      even name the name of the company, the name of the persons.

23      It's literally a seven-page, heavily-redacted document, with a

24      bunch of lines, and it's entirely in black.

25              That's our objection, Judge.

1           MR. GOTTFRIED:  Your Honor, so Exhibit Number 10 is a

2    JetBlue flight manifest that was produced to defense counsel,

3    along with a certificate of custodian of business records,

4    under Rule 11's 803(6) and 902(11), and it was also provided

5    notice that we would move to admit it as a business record, as

6    a self-authenticating document.

7           It is a JetBlue flight manifest regarding one of

8    Keishla's prior boyfriends, whom the police did interview at

9    the time of her disappearance, which shows that he was in New

10   York at the time of the incident.  So we think it's clearly

11   relevant to the facts in this case.

12          MR. GONZALEZ-DELGADO:  Your Honor, all it shows -- it

13   doesn't show that he was there.  It shows that a person by the

14   name of Marcelino Perez -- I mean, it doesn't even show that.

15   It just says Marcelino Perez, is what I can get here.

16          If you look at the document, there is nothing that

17   could identify this as a flight log, because even if we go up

18   to the first part of it, we don't know what company, when was

19   it prepared, who was it prepared by.  There is nothing in this

20   document to certify that, what Brother Counsel is stating.

21   There is no reliability.

22          MR. GOTTFRIED:  Your Honor, with that document, it

23   was produced a certificate of custodian of business records.

24   We do not admit that certificate with the exhibits.  We have

25   not done it with the phone records.  We have not done it with

1    this because that is a document prepared in preparation for

2    ligation by the company.

3            And we understand that unless the company were

4    present, it could create confrontation clause issues.  To the

5    extent that defense counsel wants us to admit the certificate

6    of custodian of business records, we can do that.  It was

7    provided to them.  We have no issue with that.

8            MR. GONZALEZ-DELGADO:  Your Honor, even the

9    government admits that if they do provide the document to

10   authenticate the exhibit, I mean the Government Identification

11   2, it might -- 10, 10, yes -- it might bring *Crawford* issues

12   and confrontation issues.  So that's evidence that this

13   document is not self-authenticating, and if they do present the

14   document to authenticate it, they have confrontation issues,

15   which defeats the purpose of Rule 901 --

16           MR. GOTTFRIED:  902(11).

17           MR. GONZALEZ-DELGADO:  -- 902(11), that they're

18   trying to present.

19           MR. GOTTFRIED:  Your Honor, the practice is that we

20   provide the certificate of business records to opposing counsel

21   so that they can verify the information that's provided.  And

22   if they want to, they can challenge its admissibility under

23   902(11).  But what goes to the jury is the business record

24   itself.  And that's what we're doing here with the phone

25   records, as well as with the flight manifest.

1          THE COURT:  Objection overruled.

2          Next document?  3, 10.

3          MS. CINTRON-COLON:  And 8, Your Honor.

4          MR. GOTTFRIED:  We're moving to admit 1 through 10,

5    but the objections so far have been --

6          THE COURT:  3, 10 and 8.

7          MR. GOTTFRIED:  1 through 12, you're right.  I'm

8    sorry.

9          MS. CINTRON-COLON:  Sorry.  I don't want to be in the

10   middle.  I want Cindy to listen.

11         Yes, Your Honor.  Our objection is, once again, our

12   objection that these videos are not business videos with

13   business records -- I'm sorry, within the meaning of Rule

14   803(6) because they are not regularly conducted courses of

15   business.  These are not businesses that are dedicated to

16   storing this video-recording.

17         Also, the -- they lack -- they do not constitute an

18   exception to the hearsay rule.  The persons who are signing

19   these certifications have, we have no information or

20   reliability about their training, their expertise, if these are

21   even videos that are, in fact, recorded, even though that's

22   what, it's the statement.

23         But we have no idea if -- the training that they

24   received and -- I'm sorry.  I lost my -- yes.  The maintenance

25   that they have, the records that they keep, how long, how

1    they're usually corroborating that what is the contents of

2    these videos and the recordings are actually what is being

3    recorded, if their timestamps are correct, the dates, and if

4    they're functioning properly.

5        Because they're not reliable either, and they're

6    regularly conducted business for these precise four businesses.

7    That's our objection today in being admitted as business

8    records.

9        MR. GOTTFRIED:  Your Honor, these arguments have been

10   raised and addressed by the Court previously in ruling on this

11   motion.  Again, we provided certificates of business records

12   for each of the videos to defense counsel.

13       We are not moving to admit those certificates

14   themselves.  We're just moving to admit the videos, and the

15   Court has already ruled on these same arguments.

16       THE COURT:  Objection overruled.

17   (Sidebar conference concluded.)

18       THE COURT:  To those in the public, it is important

19   that you maintain silence.  If you do not do so, you are

20   interfering with the reporter's ability to secure an accurate

21   transcript of what is being said in the courtroom, including

22   the sidebar.  If you need to speak, please step out of the

23   courtroom.

24       Go ahead, Mr. Gottfried.

25       MR. GOTTFRIED:  Your Honor, the government again

1    moves into evidence Exhibit Number 1, T-Mobile record for

2    (787)485-6855; Exhibit Number 2, T-Mobile record for

3    (787)963-3693; Exhibit Number 3, AT & T record for

4    (787)340-7865; Number 4, AT & T record for (787)397-2408;

5    Exhibit 5, surveillance video from Veoveo Optika.  That's

6    V-E-O-V-E-O, and Optika with a "K"; Exhibit Number 6 that the

7    government moves into evidence, surveillance video from Villa

8    Esperanza; Exhibit 7, surveillance video from Lavis, L-A-V-I-S,

9    Autentico; Exhibit Number 8, which is broken down into A, B, C,

10   D, E, is all surveillance video from autopistas Puerto Rico and

11   the plaza peaje, the toll plaza.

12         The government further moves to admit Exhibit Number

13   9.  I understand that that one is without objection.  And we

14   ask the Court to take judicial notice; that is, Court order

15   under Federal Rule of Evidence 201, judicial notice of the

16   Court order granting the motion to appoint counsel, Docket

17   Number 4, in Docket Number 21-MJ-585.  And I understand that's

18   without objection.

19         MR. GONZALEZ-DELGADO:  That's correct, Your Honor.

20         MR. GOTTFRIED:  And the government further moves to

21   admit Exhibit Number 10, it's a JetBlue flight manifest, under

22   Federal Rule of Evidence 902(11).

23         The government moves to admit Documents 11A and 11B

24   as, 11A is a Spanish language document; 11B is the English

25   translation.  And those are DTOP, Department of Transportation,

1    records for the Kia Forte.  That is 11A -- I'm sorry, 11A.  11B

2    is for the Dodge Durango, DTOP records for the Dodge Durango.

3    11A, Spanish original; 11B, English translation.

4            And then the government moves to admit Exhibits 12A

5    and B.  That is the DTOP record, the Department of

6    Transportation record, for the Kia Forte.  12A, Spanish

7    language; 12B, English translation.

8            THE COURT:  All right.  Could you repeat your

9    description of 1 and 2?

10           MR. GOTTFRIED:  1 and 2 are T-Mobile records.

11   They're both T-Mobile records.  The first one is (787)485-6855.

12   The second is T-Mobile record for (787)963-3693.

13           THE COURT:  And Number 4?

14           MR. GOTTFRIED:  AT & T record for (787)397-2408.

15           THE COURT:  The request is granted.

16           MR. GOTTFRIED:  Thank you, Your Honor.

17           THE COURT:  So these would be Government Exhibits 1,

18   2, 3, 4, 5, 6, 7, 8, 9, 10, 11A, 11B, 12A, 12B.

19           MR. GOTTFRIED:  With the clarification that Exhibit 8

20   has A, B, C, D, E.  It's all the same surveillance video from

21   autopistas, but just different cameras or angles.

22           THE COURT:  Noted.

23      (Exhibit Nos. 1 through 12 admitted into evidence.)

24           MS. COLLAZO-ORTIZ:  Your Honor, we're ready for our

25   first witness.

```
 1              THE COURT:  Go ahead.
 2              MS. COLLAZO-ORTIZ:  We call Ms. Keila Ortiz-Rivera.
 3              THE COURTROOM DEPUTY CLERK:  Ms. Ortiz-Rivera, please
 4    rise and raise your right hand.
 5        (Witness sworn.)
 6              THE COURTROOM DEPUTY CLERK:  So help you God.  You
 7    may take a seat.
 8                       KEILA ORTIZ-RIVERA,
 9           called as a witness on behalf of the Plaintiff,
10                 having been previously duly sworn,
11               was examined and testified as follows:
12                       DIRECT EXAMINATION
13    BY MS. COLLAZO-ORTIZ:
14    Q    Good afternoon, Ms. Ortiz-Rivera.
15    A    Good afternoon.
16    Q    Can you please state your full name again?
17    A    Keila Ortiz-Rivera.
18    Q    And what is your age?
19    A    46.
20    Q    And where do you currently reside?
21    A    In Puerto Rico.
22    Q    And where did you reside in April of 2021?
23    A    In Orlando, Florida.
24    Q    And who did you live with when you were residing in
25    Orlando?
```

```
 1   A    With my son, Jonathan.

 2   Q    And where did you work when you lived in Orlando?

 3   A    At a church.

 4   Q    Doing what?

 5   A    Maintenance.

 6   Q    You mentioned a son named Jonathan.  Can you tell us his

 7   full name?

 8   A    Jonathan Roman-Ortiz.

 9   Q    Do you have any other children?

10   A    Yes.

11   Q    What are their names?

12   A    Keishla Rodriguez-Ortiz, and Bereliz Rodriguez-Ortiz.

13   Q    And let me ask you, where did you raise your children?

14   A    In Manuel A. Perez.

15   Q    Can you please describe your daughter Keishla as she was

16   growing up?

17   A    Yes.

18   Q    Please go ahead.

19            MR. GONZALEZ-DELGADO:  Your Honor, we have an

20   objection under 401.

21            THE COURT:  Overruled.

22   BY MS. COLLAZO-ORTIZ:

23   Q    Go ahead.

24   A    Since she was a child, Keishla was a good-hearted girl,

25   very kind.
```

1              MR. GONZALEZ-DELGADO:  Objection under 403 then.

2              THE COURT:  Overruled.

3              THE WITNESS:  A good daughter, a good sister.  She

4    always wanted to help those that needed her help.  She was an

5    animal lover since she was young.  The best daughter that a

6    parent could have, that was Keishla.

7    BY MS. COLLAZO-ORTIZ:

8    Q    What did she do for a living?

9    A    She worked at a grooming.

10   Q    Doing what?

11   A    She bathed and cut little dogs' hairs.

12   Q    And back in 2021, when you were living in Orlando, how

13   often would you visit Puerto Rico?

14   A    Every two or three months, I would travel.

15   Q    And where would you stay when you traveled to Puerto Rico?

16   A    Either at Keishla's house or Bereliz's.

17   Q    Where did Keishla live?

18   A    At the Villa Esperanza Housing Project.

19   Q    Who did she live with?

20   A    With her two dogs and her two kittens.

21   Q    And where did Bereliz live?

22   A    At the same housing project:  Villa Esperanza.

23   Q    How often do you normally talk to Keishla back in April of

24   2021?

25   A    All day, sometimes five, six, seven, eight times a day,

1    all day long.

2    Q    Was there a particular time that you spoke?

3    A    No.

4    Q    And what time do you normally have that first call in the

5    day?

6    A    Between 6:30 and 7:00 a.m.

7    Q    And why that time?

8    A    Because that was the time when I was on my way to work.

9    Q    And all those times that you spoke during the day, what

10   did you talk about?

11   A    Of all of the things that happened at work.  We would

12   always talk about all those things that we would do after we

13   got out of work.

14   Q    How would you communicate?  What applications would you

15   use, if any?

16   A    Regular calls, video calls, and WhatsApp.

17   Q    Did you ever talk about her relationships?

18   A    I'm sorry?  Come again?

19   Q    Did you ever discuss her relationships?

20   A    Yes.

21   Q    And in April of 2021, was she in a relationship?

22   A    Yes.

23   Q    Who was she in a relationship with?

24   A    With Felix Verdejo.

25   Q    And how long had she been in a relationship with Mr. Felix

1    Verdejo?

2    A    For about 10 years.

3    Q    Where did they meet?

4    A    In school.

5    Q    Was that middle school?  High school?

6    A    Middle school.

7    Q    And over those 10 years, how often did you see Mr. Felix

8    Verdejo?

9    A    I'm sorry?

10   Q    How frequently did you see Mr. Felix Verdejo throughout

11   that time?

12   A    Well, when I came to see my daughters.  Every two or three

13   months when I came, I would see him.

14   Q    Where would you see him?

15   A    Sometimes at her house, or if my daughter would come to

16   pick me up at the airport and we went out to eat, he would come

17   and meet us where we were eating.

18   Q    When you mention your daughter right now, are you talking

19   about Keishla?

20   A    I'm sorry?

21   Q    You mentioned your daughter right now.  Which daughter are

22   you talking about?

23   A    Keishla Rodriguez.

24   Q    And when you mentioned that he would show up when you were

25   having, going out for food, who were you talking about?

1    A    Felix Verdejo.

2    Q    I'm going to ask you if you, if you have seen Mr. Felix

3    Verdejo here in court today.

4    A    I have not seen him yet.

5    Q    Can you look around the courtroom and see if he's here?

6    A    Yes, Felix Verdejo.  He's wearing a brown shirt.

7         MS. COLLAZO-ORTIZ:  For the record, we ask that it be

8    noted that the witness identified the defendant.

9         THE COURT:  The record will so reflect.

10   BY MS. COLLAZO-ORTIZ:

11   Q    I'm going to call your attention to Tuesday, April 27th,

12   2021.  Do you remember talking to your daughter on that day?

13   A    Yes.

14   Q    And was that a regular call, or was that a video call?

15   A    Regular.

16   Q    What did you talk about on Tuesday, April 27th?

17   A    That day, we talked about going to work, and that morning,

18   she told me that when Felix Verdejo came out of exercising, he

19   was going to go to her house to pick up the pregnancy test, the

20   blood ones.

21   Q    Okay.  That conversation that you're referring to where

22   Keishla mentioned Felix Verdejo going to meet her, was that on

23   Tuesday or on Thursday?

24        MS. CINTRON-COLON:  Objection, Your Honor, leading.

25        THE COURT:  Overruled.

1                    THE WITNESS:  Thursday.

2     BY MS. COLLAZO-ORTIZ:

3     Q    So that's Thursday, April 29th, correct?

4     A    Yes.

5     Q    Okay.  But I want to start first by talking about Tuesday,

6     April 27th.  Did you talk to your daughter on Tuesday, April

7     27th?

8     A    Yes.  That Tuesday she called me while I was -- in the

9     afternoon.  I was at work.  And that was a video call, and she

10    showed me the pregnancy test, the urine one.

11    Q    And how did she seem when she was showing you the

12    pregnancy test?

13    A    Well, she was happy.  She was excited because she was

14    going to have her baby, because she was going to be a mother.

15    Q    And what did you do about that video call?

16    A    Well, we talked.  And I shot the picture, and I told her:

17    Come with me.

18    Q    What did you take a picture of?

19    A    I took that photo when she showed me the pregnancy test,

20    and I said:  Let's take a picture.  And I, myself, took that

21    picture.

22    Q    And I'm going to make reference to Government's ID 13.

23    Can you see something on your screen right now?

24                    MS. COLLAZO-ORTIZ:  May I approach the witness, Your

25    Honor?

 1              THE COURT:  Did you show what you have on your hand
 2    to your opponent?
 3              MS. COLLAZO-ORTIZ:  We have given copies to counsel
 4    previously, Your Honor.
 5              THE COURT:  Okay.  Approach.
 6    BY MS. COLLAZO-ORTIZ:
 7    Q    I have handed you what has been marked as Government's ID
 8    13.  Do you recognize what I have given you?
 9    A    Yes.  This is when she called me.  We were talking over
10    the camera, and I told her:  Let's take a picture.  And I took
11    that picture.
12              MR. GONZALEZ-DELGADO:  Objection, Your Honor,
13    foundation, and it hasn't been admitted into evidence.
14    BY MS. COLLAZO-ORTIZ:
15    Q    And is that a fair and accurate representation of the
16    photo you have indicated that you took?
17    A    Yes.
18              MS. COLLAZO-ORTIZ:  Your Honor, we move that ID 13 be
19    admitted as Exhibit 13.
20              THE COURT:  Mr. Gonzalez?
21              MR. GONZALEZ-DELGADO:  No objection, Your Honor.
22              THE COURT:  Without objection, so ordered.  This
23    would be Government Exhibit 13.  You may publish.
24        (Exhibit No. 13 admitted into evidence.)
25              MS. COLLAZO-ORTIZ:  May I approach to take back the

1    exhibit, Your Honor?

2                THE COURT:  Yes.

3    BY MS. COLLAZO-ORTIZ:

4    Q    So if you could describe what we are seeing on Exhibit 13.

5    A    My daughter Keishla, me at the top, and she's showing me

6    the photo, the pregnancy test, the urine test.

7    Q    And what do you do after she showed you that pregnancy

8    test?

9    A    I told her to come with me to Orlando.

10   Q    Why did you tell her that?

11   A    Well, because I was afraid because of the threats that he

12   told her not to have it, not to have the baby.  I said to her:

13   Come with me.

14               MR. GONZALEZ-DELGADO:  Objection, Your Honor, lack of

15   foundation.

16               THE COURT:  Ms. Collazo?

17               MS. COLLAZO-ORTIZ:  May we approach?

18               THE COURT:  Yes.

19       (Sidebar conference commenced.)

20               MS. COLLAZO-ORTIZ:  Your Honor, we're asking about

21   why she asked what she did, what her own personal decision to

22   do something, not about someone else.  So the personal

23   foundation, personal knowledge, is established because it's her

24   own thoughts of why she did or asked her to come with, to move

25   with her to Orlando.

1          MR. GONZALEZ-DELGADO:  We move to strike the part

2     that said that it was because of threats.

3          MS. CINTRON-COLON:  Because, one, by her saying

4     because she was afraid, that is why she felt the way, she felt

5     compelled to ask her to move.  But the because part is not --

6          MR. GONZALEZ-DELGADO:  Lack of foundation.

7          MS. CINTRON-COLON:  Plus, it's also hearsay because

8     they have not laid the foundation as to who said this.  And

9     regardless, it's not the reason why she did it.  Her saying

10    she's afraid, that's enough reason.  But the rest of the

11    sentence, that's what we're objecting to, Your Honor.

12         MR. GOTTFRIED:  Your Honor, to the extent it's a

13    hearsay objection, it's the effect on listener.  She's saying

14    that she asked her daughter to come see her in Florida because

15    of the threats.

16         THE COURT:  It is not hearsay.

17         MR. GOTTFRIED:  Right.  But if the issue is the lack

18    of foundation, she's saying in the context of the conversation

19    that she's having with Keishla she's worried about the threats

20    from Verdejo, and, therefore, she tells.  So the foundation is

21    the conversation with Keishla.

22         MR. GONZALEZ-DELGADO:  There is no evidence

23    whatsoever, there is no evidence whatsoever that Mr. Verdejo

24    threatened her.

25         MS. CINTRON-COLON:  Nor that she has said these were

1    threats from Mr. Verdejo or he about anyone.  That's exactly

2    the point, her being afraid, yes.  But threats made by him,

3    because different would be the case if she said because of

4    threats, but she said because he had threatened her.  I was

5    afraid of the threats he had made.  That's a lack of

6    foundation.

7            THE COURT:  Well, threats are threats.  But I guess

8    defense counsel is concerned about the details underlying those

9    threats.  Where do those threats came from, under what

10    circumstances, that's what you have in mind?

11            MR. GONZALEZ-DELGADO:  Yes, because --

12            THE COURT:  It's okay.  You said yes.  I understand.

13            MR. GOTTFRIED:  To the extent the Court wants us to

14    go into details as to where those threats came from, I don't

15    know if we could do that with the witness.

16            THE COURT:  Well, would you be doing that with this

17    or other witness?

18            MR. GOTTFRIED:  This witness, what she means by

19    threats.

20            THE COURT:  I suggest you do it.  Not only what she

21    means by threats, you already said that, the baby and not

22    having the baby, as I recall.  But threats, they come from

23    somewhere, here from Mr. Verdejo, but what else?  What else?

24            Why did she know there were threats?  Threats in what

25    context?  What came before, what came next, when those

1    statements that she has characterized "threats" came from?

2    That's what I think is missing at this particular point.

3                MS. CINTRON-COLON:  Yes.

4                THE COURT:  So --

5                MS. COLLAZO-ORTIZ:  Your Honor, I would need to look

6    at the record to not misquote the witness as to the last thing

7    she said.

8                THE COURT:  Sure.

9            So I'm going to, I'm going to leave the objection

10   open to see how the material is developed.

11       (Sidebar conference concluded.)

12               THE COURT:  At this point, let's take a short

13   10-minute break.  Before we do that, let me remind the ladies

14   and gentlemen of the jury that they should not talk about or

15   communicate with anybody, including themselves, about their

16   impressions of the case or the evidence.

17           Do not view, read or hear reports, comments or

18   articles about the case.  Do not conduct any research about the

19   case, the matters in the case or the individuals involved in

20   the case.

21           With this, ladies and gentlemen, I look forward to

22   seeing you all back in the courtroom in about 10 minutes.

23       (Whereupon the following proceedings were had in open court

24       without the presence of the jury.)

25               THE COURT:  Ms. Ortiz, we're going to take a short

1    10, 15-minute break.  You do not have to stay where you are.

2    You can step out of the witness stand and walk around and

3    stretch your legs, move across or around the courtroom, or even

4    go outside.

5            The important thing is, I do not want you talking

6    about this case with anybody, including members of the

7    prosecution.

8            Do you understand, ma'am?

9            THE WITNESS:  I did.

10           THE COURT:  All right.  We'll be back in about 10 or

11   15 minutes.

12       (Sidebar conference commenced.)

13           THE COURT:  Ladies and gentlemen, we are in break,

14   but if you are going to talk, you need to step outside.  We are

15   having a sidebar.  The court reporter needs to secure an

16   accurate transcript of what's going on, so I would appreciate

17   your cooperation.

18           You can stay in the courtroom, but you need to stay

19   away from talking.  You can go outside, and then outside you

20   can talk.  Thank you.

21       (Sidebar conference commenced.)

22           MR. GOTTFRIED:  There is a victim-witness coordinator

23   in our office, and as I understand, there is no objection from

24   defense if the witness just spends time with the victim-witness

25   coordinator.  She will not talk about the case.

```
1                THE COURT:  No.

2                MS. CINTRON-COLON:  We don't have an objection to

3       that.

4                THE COURT:  What I instructed her was not to talk

5       about the case.  Otherwise, she can talk to you, if she wants.

6                MR. GOTTFRIED:  No.  That's okay.

7                MR. GONZALEZ-DELGADO:  We have no objection.

8                MS. CINTRON-COLON:  We have no problem, Judge.

9                THE COURT:  Okay.

10          (Sidebar conference concluded.)

11          (Whereupon a recess was taken at 3:33 p.m., until 3:53

12           p.m.)

13          (Whereupon the following proceedings were had in open court

14          without the presence of the jury.)

15               THE COURT:  All set to call the jury in?

16               MR. GONZALEZ-DELGADO:  Yes, sir.

17               MS. COLLAZO-ORTIZ:  Yes, sir.

18               THE COURT:  Let's call the jury in.

19          (Whereupon the following proceedings were had in open court

20          in the presence of the jury.)

21               THE COURT:  Welcome back to the courtroom.  Please

22       take a seat.

23               MS. COLLAZO-ORTIZ:  May it please the Court?

24               THE COURT:  Go ahead.

25       BY MS. COLLAZO-ORTIZ:
```

 1  Q    Ms. Ortiz, before the break, you had indicated that you
 2  were scared because he told her not to have it.  Can you please
 3  tell us how you learned that information or how you knew that?
 4  A    Because she told me.
 5  Q    And what were Keishla's plans for, for the baby?
 6          THE INTERPRETER:  The interpreter requests a
 7  repetition, please.
 8  BY MS. COLLAZO-ORTIZ:
 9  Q    What were Keishla's plans regarding the baby?
10  A    What she told me was that she'd have it.  She'd raise it.
11  That she would do it by herself.
12  Q    Prior to April of 2021, or in the months prior to that,
13  how would you describe the relationship between Keishla and
14  Felix?
15          THE COURT:  Don't answer.
16          MR. GONZALEZ-DELGADO:  Objection under 602, Your
17  Honor, she has personal knowledge.
18          THE COURT:  Overruled.
19          Ask again.
20  BY MS. COLLAZO-ORTIZ:
21  Q    How would you describe the relationship between Keishla
22  and Felix?
23  A    It was bad because he always treated her badly.  He always
24  told her bad words.
25  Q    What kind of words?

1    A    He would call her bitch, whore, fuck your mother.  That's

2    how he always treated her.

3    Q    Now turning your attention to Thursday, April 29th, 2021.

4    Do you remember that day?

5    A    That day I was talking to her, just like we did every day.

6    Q    At what time did you talk?

7    A    Between 6:30 and 7:00 a.m.

8    Q    And how do you know what time it was?

9    A    Because I was talking to her, and I knew the time because

10   I was already on my way to work.

11   Q    And what were you talking about on April 29th, around 6:30

12   a.m.?

13              THE COURT:  Don't answer.

14              MR. GONZALEZ-DELGADO:  We have an objection.  May we

15   approach, Your Honor?

16       (Sidebar conference commenced.)

17              MR. GONZALEZ-DELGADO:  Your Honor, we have an

18   objection to the statements made by the witness relating to her

19   daughter, because under Federal Rule 804, the exceptions to the

20   rule against hearsay, when the declarant is unavailable as a

21   witness, the Rule 804(a)(4) says that the declarant is

22   considered to be unavailable as a witness if the declarant

23   cannot be present or testify at the trial or hearing because of

24   death.

25              And I think that's the one that applies, obviously,

1      in this case.

2              But the exceptions are former testimony.  The problem

3      with this is this is former testimony that has to have been

4      provided at trial, hearing, or lawful deposition, whether given

5      during the current proceeding or a different one.

6              (B) -- this is, this is 804(b)(1)(A).

7              804(b)(1)(B) says, is now offered against a party who

8      had an opportunity and similar motive to develop by direct,

9      cross or redirect examination.

10             The 804(b)(2) is a statement under the belief of

11     imminent death.  And that is not the case in, in -- that is not

12     this case.

13             804(b)(3) is a statement against interest, but it has

14     to be made by a reasonable person in the declarant's position,

15     would have made only if the person believed it to be true

16     because when made it was so contrary to the declarant's

17     proprietary or pecuniary interest or had so great a tendency to

18     invalidate the declarant's claim against someone else or to

19     expose the declarant to civil or criminal liability.

20             804(b)(3)(B) says that it has to be supported by

21     corroborating circumstances that clearly indicate its

22     trustworthiness if it is offered in a criminal case as one that

23     tends to expose the declarant to criminal liability.

24             Nothing that she has stated exposes Mr. Verdejo to

25     criminal liability.

1          804 -- the case law, yes.  804(b)(4) is a statement

2   of personal or family history.  And that's not, that's not in

3   this case.

4          And 804(b)(6) is a statement offered against a party

5   that wrongfully caused the declarant's unavailability, is a

6   statement offered against a party that wrongfully caused the

7   declarant's unavailability as a witness and did so intending

8   that result.

9          At that time that this is happening, this exception

10  804(b)(6) does not apply.  They transferred to Rule 807,

11  residual exceptions, and in the residual exceptions, 807

12  requires:

13         Under the following conditions, a hearsay statement

14  is not excluded by a rule against hearsay, even if the

15  statement is made -- is not admissible under a hearsay

16  exception in Rule 803, 804, if the statement is supported by

17  sufficient guarantees, sufficient guarantees of trustworthiness

18  after considering the totality of circumstances under which it

19  was made in evidence, if any, corroborating the statement.

20         There is no evidence and no foundation as to, that

21  might corroborate the statements that the witness has just

22  made.

23         807(a)(2) says that it is more probative on the point

24  for which it is offered than any other evidence that the

25  proponent can obtain through reasonable results.

1              They have multiple witnesses.  They have text
2    messages.  They have conversations.  They've got videos that
3    prove that this exception does not apply.
4              And 807(b) requires that the -- the statement is
5    admissible only if the proponent gives an adverse party
6    reasonable notice of the intent to offer the statement,
7    including substance and the declarant's name, so that the party
8    has a fair opportunity to meet it.  The notice must be provided
9    in writing, and that, even though that was provided, the
10   subsection (A) does not apply.
11             THE COURT:  Mr. Gottfried?
12             MR. GOTTFRIED:  Your Honor, this was something that
13   the Court -- that the government raised prior to the trial in
14   the motion in limine, Document Number 308, which defense
15   contested, and which the Court granted at Document 506.  The,
16   in particular, the request that was granted was that, quote:
17             "The Court should admit under the Rule 803(3)
18   exception the statements by Keishla Rodriguez-Ortiz made on
19   both April 28th, 2021, and April 29th, 2021, that she intended
20   to meet with Felix Verdejo on the morning of April 29th, 2021,
21   to show him a pregnancy," unquote.
22             So it's not under 804.  It's not under residual
23   exception.  It was under 803(3), which is statement of a plan.
24   And, again, that was thoroughly briefed by the parties,
25   considered by the Court, and the Court held that the hearsay

1    exception did apply, allowing us to get in Keishla's

2    statements.

3              MR. GONZALEZ-DELGADO:  If it's for the planning of

4    the meeting.  This has nothing to do with the meeting.

5              MR. GOTTFRIED:  This is Keishla saying that she plans

6    to meet Verdejo on April 29th.

7              THE COURT:  I've heard enough.  Objection overruled.

8              You were going to say something?

9              MS. CINTRON-COLON:  I was, yes.

10             THE COURT:  Go ahead.

11             MS. CINTRON-COLON:  Sorry.  The last statements as

12   best, to the best of my recollection, I have in my notes, are

13   not the plans to meet, but also all the words and the pregnancy

14   tests that she was doing.  I can refer to the record, if I'm

15   mistaken.

16             MS. COLLAZO-ORTIZ:  We haven't gone into that.

17             MS. CINTRON-COLON:  She talked about it.

18             THE COURT:  One at a time.

19             Objection overruled.

20       (Sidebar conference concluded.)

21             THE COURT:  Go ahead.

22   BY MS. COLLAZO-ORTIZ:

23   Q    Ms. Ortiz, going back to that call that you had on April

24   29th, 2021, around 6:30 a.m., with your daughter Keishla, based

25   on that conversation, what plans did Keishla have for that day?

```
1    A    Keishla told me that morning that Felix Verdejo was going
2    to go to her house after he finished exercising so that she
3    could show him the blood pregnancy test, and I told her to be
4    careful.
5    Q    And what time does Keishla normally start her work?
6    A    At 8:00 a.m.
7    Q    And how far is her location of work from her house?
8    A    About 30 minutes, 40 minutes.
9    Q    And are you aware where she was when she was talking to
10   you at 6:30 a.m.?
11   A    At her house.
12   Q    And regarding the plans that she had, where did she plan
13   to meet him?
14   A    He was going to go to her house.
15   Q    At what time?
16   A    In the morning, because if she started working at 8:00, he
17   was going to go there early, before she went to work.
18   Q    And how did she seem during that phone call that you had
19   that day?
20   A    I'm sorry?
21   Q    How did she seem during that call?
22   A    She talked normally to me.
23   Q    Okay.  And did you -- how long was that conversation,
24   approximately?
25   A    About a half hour.
```

```
1    Q    And did you ever talk to her after that?

2    A    No.

3    Q    When did you next hear anything related to Keishla?

4    A    I'm sorry?

5    Q    When was the -- when did you hear anything else related to

6    Keishla after that call?

7    A    When I arrived in Puerto Rico, I called the police, like a

8    responsible mother had to do, look for my daughter.

9    Q    And why did you come to Puerto Rico?  Can you please

10   explain what happened between the call and the time that you

11   came to Puerto Rico?

12   A    Well, after I talked to her between 6:30 and 7:30 a.m., I

13   was at work in Orlando, Florida.  And approximately at 9:00

14   a.m., I received a call from my other daughter, Bereliz, and

15   she told me that Keishla was not at work.  That seemed strange

16   to me because Keishla never did that, and after, I talked to

17   her.

18   Q    Okay.  And after you heard that Keishla was not at work,

19   what was your reaction to that?

20   A    I was scared because I said:  Something is happening here.

21   Because that's not normal.  I became scared.

22   Q    And what did you do?

23   A    I'm sorry?

24   Q    What did you do after you heard that news?

25   A    I do not understand the question.
```

1    Q    Okay.  So you felt scared because you said that was not

2    normal.  What do you do after you are told that she didn't

3    arrive at work?

4    A    At around when, at around that time, at around the time

5    when my daughter Bereliz called me and told me she was not at

6    work, I told Bereliz:  Call Felix Verdejo, because that is not

7    normal.

8         Because she told me in the morning that she was going

9    to meet him.  And I told her to call him, and that's when we --

10   when I talked to him when we did the three-line.

11        MR. GONZALEZ-DELGADO:  Your Honor, may we approach?

12   We have an objection.

13        (Sidebar conference commenced.)

14        MR. GONZALEZ-DELGADO:  Your Honor, my objection is

15   under hearsay.  The statements that she is making relate to

16   Bereliz, who has been announced as a witness.

17        MS. CINTRON-COLON:  Potential witness.

18        MR. GONZALEZ-DELGADO:  Potential witness.  My

19   objection is, whatever Bereliz has said, and the witness has

20   stated, that the jury has heard, we want the Court to hold in

21   abeyance our objection in case the government does not produce

22   Bereliz Ortiz, Bereliz Rodriguez-Ortiz, as a witness.

23        Because if not, I'd ask the Court to strike from the

24   record the hearsay made by Bereliz, and that the government

25   rephrase their questions and not elicit answers that Bereliz

1    might have provided.

2            MS. COLLAZO-ORTIZ:  Your Honor, regardless of whether

3    Ms. Bereliz Rodriguez will testify or not, the statement is not

4    hearsay because it's effect on listener.  Why did you call Mr.

5    Verdejo?  Because Keishla didn't show up to work.  And that was

6    communicated to her through Bereliz.  But that is effect of

7    listener.  It's not hearsay.

8            MR. GONZALEZ-DELGADO:  It is, Your Honor, because she

9    could have said:  My daughter called me; Bereliz called me; and

10   from what she told me, I reacted this way.  That's the proper

11   way to do it, if it's not going to be hearsay.

12           If the government is going to bring her as a witness,

13   well, it's admissible because I will have an opportunity to

14   cross-examine the witness.  But if not, if they do not bring

15   her in, I want the Court to take, hold into abeyance our

16   request, our objection under hearsay, because that is, the

17   statements made by Bereliz to her mother are all hearsay.

18           They are not against interest.  They are not --

19           MS. CINTRON-COLON:  Not within any exception.

20           MR. GONZALEZ-DELGADO:  -- not within any exception.

21           MR. GOTTFRIED:  Briefly, Your Honor.  I don't think

22   it's relevant to whether or not we call Bereliz as whether or

23   not it's hearsay.  It's a question of why is it being admitted,

24   for the truth of the matter asserted.  It's not.

25           Regardless of whether or not what Bereliz said was

1    true, what we're introducing it is to show the effect on the

2    witness, namely why did she call Mr. Verdejo.  It wasn't

3    something that she did at random.  It was something she did at

4    the prompting of Bereliz and based on what Bereliz told her.

5                THE COURT:  Objection overruled.

6        (Sidebar conference concluded.)

7    BY MS. COLLAZO-ORTIZ:

8    Q    You were saying that you had a three-line call.  Who was

9    in that three-line call?

10   A    Me, my daughter Bereliz, and Felix Verdejo.

11   Q    And how do you know it was Felix Verdejo on the other

12   side?

13   A    Because I talked to him.

14   Q    And what, what -- why did you call him?

15   A    I made my daughter Bereliz call him so that I could ask

16   him where was my daughter, my daughter Keishla.

17               MS. CINTRON-COLON:  Your Honor, may we approach

18   again?  Thank you.

19       (Sidebar conference commenced.)

20               MS. CINTRON-COLON:  Your Honor, we are renewing our

21   objection on hearsay because what the government elicited to us

22   was that she had made this phone call; therefore, it was the

23   effect on the listener.  What Bereliz told her, what made her,

24   is her reaction.

25               She's just testifying that she told Bereliz to call

1    Felix Verdejo.  It was not her who made the phone call.  She's
2    not making this phone call.  She's not calling Felix Verdejo.
3    It's not the effect on her making a phone call to him to get
4    this answer to the question.
5              MS. COLLAZO-ORTIZ:  She's making the phone call
6    through a proxy.  She's the one ordering Bereliz to make the
7    call.
8              THE COURT:  Objection overruled.
9         (Sidebar conference concluded.)
10   BY MS. COLLAZO-ORTIZ:
11   Q    Ms. Ortiz, what happened during that call?
12   A    I asked him three times where my daughter was.  I asked
13   him:  Where is my daughter that you were going to meet?  And
14   he, with a nervous voice:  I don't know; I don't know.  And I
15   asked him again:  Where is my daughter, because you are now
16   lying to me, because she told me you were going to go to her.
17             And the third time I told him, Where is my daughter,
18   he said, I don't know, with his nervous voice.  And I told him:
19   Right now I will get on a plane.
20   Q    And did you, in fact, get on a plane?
21   A    Yes.
22   Q    Why did you get on a plane?
23   A    Because my motherly instinct told me that something was
24   happening, because it wasn't normal for her not to go to work.
25   Q    So what do you do upon concluding that call?

```
 1    A    I clock out of work.  I left.  And I continued calling her
 2    after I left work and calling her and calling her, and she
 3    wouldn't pick up the phone.
 4    Q    Was that normal, that she didn't pick up the phone?
 5    A    That was not normal.
 6    Q    How many times in the past had you been unable to reach
 7    her by phone?
 8              MR. GONZALEZ-DELGADO:  Objection under 401, Your
 9    Honor.
10              THE COURT:  Overruled.
11    BY MS. COLLAZO-ORTIZ:
12    Q    How many times in the past have you been unable to reach
13    her on the phone?
14    A    It's just that that had never happened.  I always knew
15    where she was.
16    Q    And what happened when you got to the airport?
17    A    The first thing that I did was I continued calling her and
18    calling her, and she wouldn't pick up the phone.
19    Q    And what happened next?
20    A    Well, after I got here to Puerto Rico, my daughter Bereliz
21    went to pick me up at the airport, and from there, we went to
22    an abortion clinic that was close to the house.  I was
23    desperate about my daughter.
24    Q    Why did you go to an abortion clinic?
25    A    Well, since he did not want to -- since he did not want
```

1    the baby, I said:  Well, he took her to an abortion clinic.  He

2    threatened her, and he took her there forcefully and just:  Do

3    it; do it.

4    Q    And did that have any result?

5    A    No.  After the abortion clinic, I went to her house, and

6    upon entering her house, I felt a bad impression that something

7    bad was happening.

8    Q    What do you do after you went to Keishla's house?

9    A    I went to her house, and I got a very bad impression that

10   something was happening.  And from there, we went to Caimito,

11   to the police station, to file a complaint.

12   Q    And what happened at the police station?

13   A    When I went to the police station, I explained that my

14   daughter didn't turn up; that she was pregnant by Felix

15   Verdejo.

16   Q    And aside from the police, did you seek help from anyone

17   else?

18   A    Yes.  I started making many phone calls to see who could

19   help me find her.

20   Q    And who do you call?

21   A    I called Marcelino and Ivan.

22   Q    Who is Marcelino?

23   A    A person who was with her many years ago.

24   Q    And why do you call him?

25   A    So that he could help me.

```
1    Q    Help you do what?

2    A    To find Keishla.

3    Q    And how did he react to your call?

4              MR. GONZALEZ-DELGADO:  Objection, Your Honor.  That's

5    hearsay.

6              THE COURT:  Overruled.

7              MR. GONZALEZ-DELGADO:  Objection, Your Honor.  There

8    is no exception.

9              THE COURT:  Overruled.

10             THE WITNESS:  He became desperate:  How could that

11   be?

12   BY MS. COLLAZO-ORTIZ:

13   Q    And you also mentioned you called Ivan.  Who is Ivan?

14   A    Another person who had also been with her.  I called her

15   desperately so that they could help me find her.

16   Q    And how did he react?

17             MR. GONZALEZ-DELGADO:  Objection again, Your Honor.

18             THE COURT:  Overruled.

19             MR. GONZALEZ-DELGADO:  602, and it calls for

20   speculation.

21             THE COURT:  Overruled.

22             THE WITNESS:  He, also desperate:  Not to Keishla.

23   BY MS. COLLAZO-ORTIZ:

24   Q    Okay.  You mentioned these were people that Marcelino --

25             I withdraw that question.  Let me rephrase.
```

1              In terms of Marcelino, when or how long ago had he

2    been in a relationship with Keishla?

3    A    Many years ago.

4    Q    And what about Ivan, how long ago had he been in a

5    relationship with Keishla?

6    A    Just the same, many years ago.

7    Q    What happened after you went to the police precinct in

8    Caimito?

9    A    After going to the Caimito police precinct, we went to the

10   police headquarters, the big precinct.

11   Q    And what happened at the police, at the police

12   headquarters?

13   A    Well, the police headquarters, the investigation started.

14   Marcelino came to the police headquarters to help find her.

15              MR. GONZALEZ-DELGADO:  Objection, calls for state of

16   mind, Your Honor.  Move to strike.

17              THE COURT:  Overruled.

18   BY MS. COLLAZO-ORTIZ:

19   Q    And after you went to the police headquarters, did you go

20   anywhere else with the police?

21   A    Yes.  We, we got on the patrol car, and we went to where

22   Felix Verdejo lived, with the police.

23   Q    And where else did you go?

24   A    We also went to Ivan's house.

25   Q    And what happened at Ivan's house?

```
 1    A    Nothing.  The police looking, looking for answers.

 2    Q    What did you see the police officers do there?

 3    A    I'm sorry?

 4    Q    What do you see the police officers do there?

 5    A    There at Ivan's house?

 6    Q    Yes.

 7    A    Well, the police got down from the car because they wanted

 8    to interview him.

 9    Q    And after that, what happened?

10    A    Well, after that, we continued looking for her, looking

11    for her, and the days continued passing by.

12    Q    And how did you find out that Keishla had been found?

13    A    Because that May 1st, we were at the headquarters for a

14    meeting, me and the family, and all of the sudden our cell

15    phones went off with the news shooting notifications that

16    something had turned up at the lagoon.

17    Q    And what happened after you and your family received those

18    notifications?

19    A    We ran from the headquarters.  And when we arrived at the

20    lagoon, a friend of Keishla's father, he got us on a small

21    boat, and we got closer to her.

22    Q    And what do you see?

23    A    I, when I saw that, the blue clothing, I thought that it

24    was a tarp that had been discarded.

25    Q    And what do you do after the lagoon?
```

1    A    Well, we turned around, and when they took her out, we

2    turned around and went directly to Forensics.

3    Q    You mean the Institute of Forensic Sciences?

4    A    Yes.

5    Q    And why do you go there?

6    A    My motherly instinct:  Let's go there because -- let's go

7    there.

8    Q    What happened when you got there?

9    A    Well, we waited outside for a while until we were called.

10   Q    And what happened when you were called?

11   A    They showed us a picture of a tattoo that she had on her

12   back with a diamond, like they called him:  Felix Verdejo.

13          MS. COLLAZO-ORTIZ:  For the record, the witness

14   gestured to her upper back.

15          THE COURT:  The record will so reflect.

16          MS. COLLAZO-ORTIZ:  Your Honor, we ask permission to

17   approach the witness with Government Identification 95.

18          THE COURT:  Go ahead.  Did you show that to your

19   opponent?

20          MS. COLLAZO-ORTIZ:  Yes, Your Honor.

21          THE COURT:  Okay.

22   BY MS. COLLAZO-ORTIZ:

23   Q    Ms. Rodriguez, I have provided you with what has been

24   marked as Government ID 95.  Do you recognize what is depicted

25   in Government ID 95?

```
 1                MS. COLLAZO-ORTIZ:  Correction to the interpretation.
 2   BY MS. COLLAZO-ORTIZ:
 3   Q    Do you recognize what is seen on Exhibit 95?  I'm sorry.
 4   ID 95?
 5   A    This is a picture that was shown to me at Forensic
 6   Sciences.
 7   Q    Is that a fair and accurate representation of what you saw
 8   when you went to the Institute of Forensic Sciences?
 9   A    Yes.
10                MS. COLLAZO-ORTIZ:  Your Honor, we ask that ID 95 be
11   admitted as Exhibit 95.
12                MR. GONZALEZ-DELGADO:  No objection, Your Honor.
13                THE COURT:  Without objection, so ordered.  This
14   would be government exhibit?
15                MS. COLLAZO-ORTIZ:  95, Your Honor.
16                THE COURT:  95.
17      (Exhibit No. 95 admitted into evidence.)
18                MS. COLLAZO-ORTIZ:  May I publish?
19                THE COURT:  Yes.
20   BY MS. COLLAZO-ORTIZ:
21   Q    Ms. Rodriguez -- I'm sorry.  Ms. Ortiz, how long had
22   Keishla had this tattoo?
23   A    For several years.
24                MS. COLLAZO-ORTIZ:  Your Honor, permission to
25   approach the witness with Government ID 14, which we've shown
```

1    to counsel.

2                THE COURT:  Go ahead.

3                MS. COLLAZO-ORTIZ:  I have provided the witness with

4    Government ID 14.

5    BY MS. COLLAZO-ORTIZ:

6    Q    Ms. Ortiz, without telling me what is on that document, I

7    want you to tell me if you recognize it.

8    A    Yes.

9    Q    For what reason do you recognize it?

10   A    My daughter's assassin.

11               MR. GONZALEZ-DELGADO:  Objection, Your Honor, move to

12   strike and to instruct the witness.

13               MS. COLLAZO-ORTIZ:  May we approach?

14               THE COURT:  Yes.

15       (Sidebar conference commenced.)

16               MS. COLLAZO-ORTIZ:  We have no objection that it be

17   stricken.  That's not the answer we were trying to elicit.  The

18   picture is not of -- is of a group of people including Mr.

19   Verdejo and others, including the victim and the witness.

20               THE COURT:  She said:  My daughter's murderer?

21               MR. GONZALEZ-DELGADO:  "Assassin."

22               THE COURT:  "My daughter's assassin," period.  I'm

23   going to tell the jury to disregard that.

24       (Sidebar conference concluded.)

25               THE COURT:  Ladies and gentlemen, the witness just

1    said "my daughter's assassin."  You will disregard that

2    statement.

3              Go ahead.

4              MS. COLLAZO-ORTIZ:  Can I return the exhibit to the

5    witness, Your Honor?

6              THE COURT:  Yes.

7              MS. COLLAZO-ORTIZ:  ID.

8    BY MS. COLLAZO-ORTIZ:

9    Q    Ms. Ortiz, without going into the content or any opinions

10   about the document that I've given you, do you recognize what

11   is depicted there?

12   A    Yes.

13   Q    Why do you recognize it?

14   A    That picture is from one of the times when I came to

15   Puerto Rico to visit with my daughters.  And we were in Pinones

16   eating, and after a while, he came.  That's that picture.

17   Q    And is that ID 14 a fair and accurate representation of a

18   photo taken that day in Pinones?

19   A    Yes.

20             MS. COLLAZO-ORTIZ:  Your Honor, we move that ID 14 be

21   admitted.

22             MR. GONZALEZ-DELGADO:  No objection, Your Honor.

23             THE COURT:  Without objection, so ordered.  This

24   would be Government's Exhibit?

25             MS. COLLAZO-ORTIZ:  14.

```
1                THE COURT:  14.
2          (Exhibit No. 14 admitted into evidence.)
3                THE COURT:  You may publish.
4    BY MS. COLLAZO-ORTIZ:
5    Q    Ms. Ortiz, can you please tell us the names of the people
6    that are seen there?
7    A    My grandson, Anthony Sabada; my daughter, Keishla
8    Rodriguez; me; and Felix Verdejo.
9    Q    Do you know when that picture was taken?
10   A    No.
11   Q    Was it -- can you estimate how many months, how many years
12   before April 2021?
13   A    Several months before 2021 April.
14   Q    And before that, the FaceTime call from April 2021, when
15   Keishla showed you that pregnancy test, had she ever told you
16   that she was having Felix's baby before?
17   A    Yes.  If the baby came, yes.
18   Q    Okay.  But how many times -- prior to that time, on April
19   2021, had she been pregnant by Felix before?
20   A    No.
21              MS. COLLAZO-ORTIZ:  I have no further questions at
22   this time, Your Honor.
23              MR. GONZALEZ-DELGADO:  May I have one second, Your
24   Honor?
25              THE COURT:  Yes.
```

```
 1              MS. CINTRON-COLON:  May I address the witness, Your
 2    Honor?
 3              THE COURT:  Go ahead.
 4                        CROSS-EXAMINATION
 5    BY MS. CINTRON-COLON:
 6    Q    Good afternoon, Mrs. Ortiz.  I'm going to ask you very
 7    brief questions.  Most of them can be answered with a yes or
 8    no.
 9              Ms. Ortiz, you testified to sister -- you responded
10    to Sister Counsel's questions that on April 29th, 2021, after
11    you tried calling Keishla at 7:00 a.m. and she didn't pick up,
12    you talked to your daughter Bereliz; is that correct?
13    A    Yes.
14    Q    And then you also called different people?
15    A    Yes.
16    Q    And one of those persons that you called was Mr. Miguel
17    Santiago-Lais (phonetic)?
18    A    Yes.
19    Q    And this man is also known as "Miguelito?"
20    A    Yes.
21    Q    I'm sorry.  And you asked Miguelito about Keishla?
22    A    Yes.
23    Q    You asked Miguelito where Keishla was?
24    A    Yes.
25    Q    And, Mrs. Ortiz, you called Miguelito before you called
```

 1    Mr. Verdejo?

 2    A    No.

 3    Q    You also, backtracking a little bit, you also told Sister

 4    Counsel that you had a close relationship with Keishla?

 5    A    I'm sorry?

 6    Q    You had a very close relationship with Keishla, correct?

 7    A    Yes.

 8    Q    And you said that you knew about her whereabouts all the

 9    time?

10    A    Yes.

11    Q    And in 2009, Keishla disappeared for a couple of days?

12    A    No.

13              MS. CINTRON-COLON:  I'm sorry.  Was the translation

14    2019 or 2009?

15              THE INTERPRETER:  2009.

16    BY MS. CINTRON-COLON:

17    Q    In 2010, Keishla did not pick up the phone; she was away

18    on a weekend with her boyfriend?

19              MR. GOTTFRIED:  Objection, Your Honor, beyond the

20    scope.

21              THE COURT:  Sustained.  The jury will disregard the

22    response.

23              MS. CINTRON-COLON:  May we approach briefly, Your

24    Honor?

25              THE COURT:  Yes.

1          (Sidebar conference commenced.)

2          MS. CINTRON-COLON:  Your Honor, she testified in

3    direct examination that her daughter had never disappeared;

4    that this was once-in-a-lifetime thing; that this was very

5    weird, and that's why she got so worried when she didn't pick

6    up the phone.  This event, we have good-faith belief and

7    information that this event did occur.

8          So this goes to impeachment as to her saying that her

9    daughter had never disappeared before, and that's why this was

10   so weird for her that her daughter was not picking up the

11   phone, when, in fact, a couple of years ago, she had

12   disappeared for a weekend, didn't pick up the phone, went away

13   with her boyfriend.  So this is not the first time that her

14   daughter was missing, or not picking up the phone -- I stand

15   corrected -- in a couple of hours.  It goes to impeachment just

16   for that purpose.

17         MR. GONZALEZ-DELGADO:  It is information that was

18   provided by the government that another witness stated in one

19   of her police reports.

20         MS. CINTRON-COLON:  Interviews, that she had once

21   disappeared with a boyfriend.

22         MS. COLLAZO-ORTIZ:  That wasn't recently.  That was

23   when she was in school.

24         MR. GOTTFRIED:  12 years before, when she was a kid,

25   allegedly, you know, she disappeared.  So what relevance it has

1    to what happens in 2021 --

2              MR. GONZALEZ-DELGADO:  It's impeachment.

3              THE COURT:  Disappeared because she was with her

4    boyfriend.

5              MS. CINTRON-COLON:  Yes, sir.  She purposely went

6    away.

7              THE COURT:  That was not part of direct.  It was not

8    part of direct.

9              MS. CINTRON-COLON:  What was part of direct was that

10   she never not picked up the phone, and she was always present;

11   and she always knew about her whereabouts.

12             THE COURT:  So she disappeared.  But you impeached

13   her.  But the part where the objection came in was she was with

14   a boyfriend.

15             MS. CINTRON-COLON:  Okay.

16             THE COURT:  And that was not part of direct.

17             MS. CINTRON-COLON:  Our objection is still on the

18   record.  We understand.  Thank you.

19        (Sidebar conference concluded.)

20             THE COURT:  Wait.  You will disregard the last

21   portion, the last sentence of counsel's most recent question.

22             Go ahead.

23             MS. CINTRON-COLON:  Thank you, Judge.

24   BY MS. CINTRON-COLON:

25   Q    Mrs. Ortiz, you also stated that Marcelino was a partner

1    that Keishla had various years ago; is that correct?

2    A    Yes.

3    Q    In fact, they were married?

4    A    Yes.

5    Q    For five years?

6    A    I do not recall that.

7    Q    And Marcelino kept in contact with Keishla even after

8    their divorce, correct?

9    A    Yes.

10   Q    And so even after the divorce --

11              Scratch that.  Sorry.

12              And Marcelino, in fact, was aggressive towards

13   Keishla, physically aggressive?

14   A    I don't know.  That I don't know.

15   Q    Your daughter never told you about any instance that

16   Marcelino hit her?

17              MR. GOTTFRIED:  Objection, hearsay.

18              MS. CINTRON-COLON:  May we approach?

19              THE COURT:  Sidebar.

20        (Sidebar conference commenced.)

21              THE COURT:  I did not hear during direct any

22   reference to a Marcelino being aggressive towards Ms. Keishla.

23              MS. COLLAZO-ORTIZ:  We did not elicit anything about

24   that, Your Honor.

25              MR. GONZALEZ-DELGADO:  Your Honor, we can --

```
 1                THE COURT:  Why is that being brought in?  Because he
 2     was aggressive towards Keishla?  They did not bring that in.
 3                MR. GONZALEZ-DELGADO:  But we can bring it in because
 4     the police --
 5                THE COURT:  Wait, wait, wait.  You're talking police.
 6     You're talking reports.  You're talking interviews.  That's
 7     what you said earlier.  But now you are in cross, and your
 8     boundaries are defined by direct examination.
 9                MR. GONZALEZ-DELGADO:  And direct examination, they
10     opened up the -- they, they, they opened up the doors to
11     Marcelino, to the Marcelino issue, because one of the first
12     persons that she says to the police that they have to
13     investigate is Marcelino and Ivan, and then Felix Verdejo.
14                THE COURT:  I did not hear anything about that.
15                MR. GONZALEZ-DELGADO:  Marcelino.
16                MS. COLLAZO-ORTIZ:  She did not testify that.
17                THE COURT:  Wait.  Mr. Gonzalez, wait.  I did not
18     hear anything about the witness saying:  I told the police to
19     investigate --
20                Marcelino?
21                MS. COLLAZO-ORTIZ:  Right.
22                THE COURT:  -- because he was an aggressor, or words
23     to that effect.
24                Wait.  I did not hear that.  Marcelino was mentioned.
25     She contacted Marcelino.  That's fine.  But this thing about
```

1    Marcelino being aggressive towards her, I did not hear that in

2    direct.

3              MR. GONZALEZ-DELGADO:  Your Honor, if I may.

4              THE COURT:  Go ahead.

5              MR. GONZALEZ-DELGADO:  I can go into that because

6    when the police investigated this case, Marcelino was one of

7    the suspects.  And they had to, they had to -- they're

8    presenting, actually, an alibi that he presented that he was

9    out of the jurisdiction, and he arrived that same day, at

10   night, in Puerto Rico.

11             We are going into the details, and we're trying to

12   find out why did she give the name of Marcelino to the police

13   to investigate him to see if he was part of the disappearance

14   of Keishla.  At that moment, nobody knew what had happened.

15   They had no idea what was going on.

16             And she gave the names of possible witness, possible

17   individuals who could have had something to do with this.  We

18   are entitled to probe into Mr. Marcelino's relationship with,

19   with Keishla, because we have evidence that was provided by the

20   government that Mr. Marcelino went to Keishla's job and gave

21   her a beating that almost killed her.

22             And the individual -- the owner of the grooming, the

23   owner of the grooming salon where she worked at had to

24   intervene to take him out of the store because of the beating

25   he had given her.  And she did not press charges.

Official Court

1          That is why we're requesting the -- that's why we are

2     asking if she has knowledge if Marcelino had been aggressive

3     with her prior to the events that happened here.  And that goes

4     to motive, the theory of the defense.

5          MS. COLLAZO-ORTIZ:  Your Honor, two things:  He's

6     misquoting the documents that were provided.  There is nothing

7     on the documents about a beating or anything like that that the

8     boss had to intervene.  The characterization, the

9     characterization he's making is inaccurate.

10          But, in any case, the witness already answered the

11     question, whether or not Marcelino had been aggressive, with:

12     I don't know.  So that question has already been answered.

13          MS. CINTRON-COLON:  The question actually --

14          THE COURT:  Objection -- this is beyond the scope.

15     This is beyond the scope.  So that's my ruling.

16          Later on, depending on how the evidence evolves, it

17     may come in.  I don't know.  I have not seen the evidence.  I

18     have not read extensive materials related to this case, other

19     than what was presented during the motion cycle.

20          So that's my ruling at this point.

21     (Sidebar conference concluded.)

22          THE COURT:  Ladies and gentlemen, you will disregard

23     counsel's last questions about daughter never telling the

24     witness about Marcelino hitting her.

25          Go ahead.

```
1            MS. CINTRON-COLON:  Thank you, Judge.
2   BY MS. CINTRON-COLON:
3   Q    Ms. Ortiz, Sister Counsel was asking you about previous,
4   if there were any previous pregnancies involving Mr. Verdejo
5   and Keishla.  Do you remember that question?
6   A    I'm sorry?
7   Q    The prosecutor asked you if you had any knowledge -- I'm
8   sorry, if Keishla had told you about a previous pregnancy, that
9   she was pregnant with Verdejo prior to April of 2021.  Do you
10  remember that question?
11  A    No.
12  Q    Okay.  You told Sister Counsel earlier on direct
13  examination --
14            THE COURT:  Wait.  What it was that she did not
15  remember the question?
16            MS. CINTRON-COLON:  The question, yes.  Yes, Judge.
17            THE COURT:  Could you clarify that for her?  I'm not
18  sure she understood what you wanted to ask her.
19            MS. CINTRON-COLON:  Sure.  If you give me one second
20  real quick.
21            THE COURT:  What?
22            MS. CINTRON-COLON:  Can you give me one second really
23  quickly?
24            THE COURT:  Yes.
25  BY MS. CINTRON-COLON:
```

```
 1   Q    Sister Counsel had asked you if Keishla had gotten
 2   pregnant by Mr. Verdejo before April of 2021.  Do you remember
 3   this question being asked to you earlier today?
 4   A    Can you please repeat the question?
 5   Q    Sure.  Had -- Keishla had not been pregnant by Mr. Verdejo
 6   prior to April 2021, as per your recollection, correct?
 7   A    In '21, yes.
 8   Q    Before April of 2021, is my question.
 9   A    No, not before.
10   Q    And Keishla had told you before April of 2021 that she
11   would have Verdejo's baby if she got pregnant?
12             MR. GOTTFRIED:  Objection, hearsay.
13             THE COURT:  Overruled.
14             THE WITNESS:  Can you please repeat the question
15   again?
16   BY MS. CINTRON-COLON:
17   Q    Keishla had told you before April of 2021 that if she got
18   pregnant by Verdejo, that she would have the baby?
19   A    Yes.
20   Q    And, in fact, Mr. Verdejo wanted to have a baby with
21   Keishla?
22             MS. COLLAZO-ORTIZ:  Objection, Your Honor, lack of
23   personal knowledge and foundation.
24             MS. CINTRON-COLON:  We can approach.
25             THE COURT:  Yes, approach.
```

1          (Sidebar conference commenced.)

2              MS. CINTRON-COLON:  Yes, sir.

3              THE COURT:  So your question was:  So Mr. Verdejo

4      wanted to have a baby with Keishla.  Objection.

5              So it's your objection.  Explain.

6              MS. COLLAZO-ORTIZ:  Your Honor, there is two prongs

7      to the objection:  lack of personal knowledge and lack of

8      foundation -- and actually three prongs, and hearsay.

9              They are asking the witness to go into Mr. Verdejo's

10     mind without any proper foundation of how she would know this,

11     aside from maybe something he may have said, which would be

12     hearsay because it doesn't fall under any exception.  So the

13     witness cannot answer this question without relying on multiple

14     layers of hearsay and speculating as to Mr. Verdejo's state of

15     mind.

16             THE COURT:  Well, we have not heard information as to

17     whether that is true and why so --

18             MS. COLLAZO-ORTIZ:  Lack of foundation as to how she

19     would have an answer to that question, Your Honor.

20             THE COURT:  So let me hear more of what you have in

21     mind, ma'am, because I don't know.

22             Let her explain.  She's the one asking questions.

23             MS. CINTRON-COLON:  Yes, Judge.  First, it's not

24     hearsay.  This is something that she, in fact, heard.

25             THE COURT:  No, no, no.  I heard the objection.  I

1    want to know what is it that you have in mind by asking this

2    question.  What's the context for this question?

3              MS. CINTRON-COLON:  Yes.  She was once -- she has

4    stated and -- she was once at Keishla's house with Mr. Verdejo,

5    and she, herself, Mrs. Keila Ortiz, who is sitting right here

6    in trial, said that she heard Mr. Verdejo say that he wanted to

7    have a baby with Keishla.  Now, this goes to the whole motive

8    of the case.

9              THE COURT:  When was that?

10             MS. CINTRON-COLON:  This was -- she heard it,

11   allegedly, at around 2020.

12             THE COURT:  When in 2020, more or less?

13             MS. CINTRON-COLON:  About the beginning of the year.

14   I don't have an exact date.

15             THE COURT:  Before the pandemic?

16             MS. CINTRON-COLON:  After.

17             THE COURT:  After the pandemic started.

18             MS. CINTRON-COLON:  It's memorialized in a 302 that

19   she was interviewed by police.  And she told police that about

20   a year ago, which means it's about April of 2020, that she was

21   once in Keishla's house.  They had returned from a trip from

22   Colombia, and actually, Keishla was getting plastic surgery

23   done.

24             THE COURT:  Who was returning from Colombia?

25             MS. CINTRON-COLON:  Keishla with her mother, Ms.

1    Keila.  And they just returned from Colombia, and Mr. Verdejo

2    went to Keishla's apartment where Ms. Keila was as well.  And

3    she heard Felix tell Keishla that he wanted to have a baby with

4    her.

5              This is the context of this conversation and the

6    purpose of this conversation because she does have personal

7    knowledge.  She was there during this conversation, and she

8    heard this.

9              THE COURT:  Okay.

10             MS. COLLAZO-ORTIZ:  But, Your Honor --

11             THE COURT:  Wait, wait.  How much you have with this

12   witness?

13             MS. CINTRON-COLON:  This is basically it, Your Honor.

14             THE COURT:  This is the end?

15             MS. CINTRON-COLON:  Basically.

16             MR. GONZALEZ-DELGADO:  Two more minutes.

17             MS. CINTRON-COLON:  Maybe.

18             THE COURT:  Two more minutes.

19             MS. CINTRON-COLON:  Two more minutes of my time, not

20   Mr. Gonzalez's time.

21             MS. COLLAZO-ORTIZ:  If I may add something as to

22   that.

23             THE COURT:  Go ahead.  I mean, this has to do with,

24   this has to do with motive, right?  You said during your

25   opening that Mr. Verdejo did not want to have a baby with her.

```
 1              MS. COLLAZO-ORTIZ:  Right.
 2              THE COURT:  Wait.  You said that.  And that set the
 3    stage for the rest of what you told the jury.  Now, opposing
 4    counsel, your opposing counsel, wants to impeach, in a sense,
 5    that theory, bringing in evidence that, well, at least once, in
 6    the presence of this witness, Mr. Verdejo said:  I want to have
 7    a baby with her.
 8              MS. COLLAZO-ORTIZ:  Yes, Your Honor, but that is a
 9    self-serving statement that is hearsay because no exception
10    applies.  It's defendant's statement that is being brought
11    through a third party.  So they're trying to bypass the hearsay
12    rule by bringing a statement of defendant from, through another
13    person.
14              If defendant wants to introduce that statement into
15    evidence, it needs to be done with admissible evidence.
16              THE COURT:  Now I understand, yes.  Okay.
17              MS. COLLAZO-ORTIZ:  This is his own statement, and no
18    exception applies.
19              THE COURT:  I understand, yes.
20              Okay.  Objection sustained.
21              MR. GONZALEZ-DELGADO:  Your Honor, but it's not
22    self-serving because this happened a year before any of this
23    happened.  It would have been self-serving if, after the fact,
24    Mr. Verdejo would have told this witness:  I wanted to have a
25    baby with her.
```

1                But this is something that the witness volunteered to

2     a police officer, and the police officer put it in a report.

3                THE COURT:  Wait.  That's different than what she

4     said.  Now you're bringing in police reports.

5                MS. CINTRON-COLON:  No.  I mentioned it earlier, Your

6     Honor.

7                THE COURT:  Wait, wait, wait.  If that's true, I

8     apologize.  I do not recall having heard anything about police

9     reports.

10               MS. CINTRON-COLON:  I did mention it briefly at the

11    beginning that it was part of one of the 302 that memorializes

12    one of the interviews.

13               THE COURT:  Ma'am, you need to slow down --

14               MS. CINTRON-COLON:  Yes, sir.

15               THE COURT:  -- to allow everybody here to understand,

16    but especially the court reporter.

17               MS. CINTRON-COLON:  Apologies.

18               THE COURT:  Okay.  Now elaborate on that.  You know

19    what my ruling has been.  I am willing to hear what you are

20    saying as a request for reconsideration.  So go ahead.

21               MS. CINTRON-COLON:  Yes, Judge.

22               THE COURT:  Before you go ahead -- well, go ahead.

23    I'll listen to you.

24               MS. CINTRON-COLON:  It's okay.

25               THE COURT:  Go ahead, because this is the last point

1    you want to make with her.  That's what you said.

2                    MS. CINTRON-COLON:  Basically, Your Honor, yes.

3                    THE COURT:  Well, basically is not absolutely yes.

4                    MS. CINTRON-COLON:  It was going to be my last

5    question before I reconvene with counsel to see if there was

6    something else we needed to cover, and that was it.

7                    THE COURT:  Listen, this is what we are going to do.

8    I told the jury that by 5:00, more or less, they would be out

9    of here.  They need to go through some administrative stuff

10   with the jury office before they leave campus.  For that they

11   need time.

12                   So what I am going to do is adjourn at this point.

13   We'll return tomorrow with Ms. Ortiz, and we'll take it from

14   there.  Before that, as housekeeping, I want to hear more

15   argument on this.

16                   MR. GONZALEZ-DELGADO:  Yes, sir.

17                   MS. CINTRON-COLON:  Yes, sir.

18                   THE COURT:  More argument, not based just on logic.

19   I understand the logic of what everybody is saying.  But I want

20   to have a more informed judgment on this.

21                   My gut feeling is that this does not enter because

22   it's something he said, and he cannot do it.  I mean, we cannot

23   have that type of testimony under these circumstances.  That's

24   my gut feeling, my preliminary ruling.

25                   You know what my preliminary ruling is.  So you can

1  take it from there and try to persuade me that I'm wrong.  And

2  we'll do that first thing in the morning tomorrow morning.

3          MR. GOTTFRIED:  Just to respectfully ask the Court to

4  reconsider.  If they have two minutes left, I don't think we

5  have much of any redirect, we could be done with this witness

6  who is emotionally distraught today, as opposed to bringing her

7  back tomorrow morning.

8          But, again, if Sister Counsel has two minutes, I

9  don't think we have much.  I don't think we have a direct.  We

10 could be done with her and just have her be done with this

11 portion.

12         MS. CINTRON-COLON:  If I may, briefly.  I believe

13 even though we have about two minutes left, I believe it's

14 important for our theory of defense, and for us to present the

15 case, to abide by the judge's ruling on arguing this point a

16 little further for his final ruling.  And I think it's

17 important that we actually have the break for today, and then

18 we can argue this point fresh tomorrow.

19         THE COURT:  I understand the point about Ms. Ortiz.

20 This is stressful.  But balancing out all factors, I believe I

21 need to provide the defendant leeway to persuade me that I'm

22 wrong on this.

23         MR. GOTTFRIED:  Yes, Your Honor.

24         THE COURT:  So we are going to adjourn at this point.

25         MS. CINTRON-COLON:  Thank you, sir.

1          (Sidebar conference concluded.)

2               THE COURT:  Ladies and gentlemen, we are going to

3     adjourn at this point, meaning that you will be allowed now to

4     go back to your families.  We'll reconvene here tomorrow to

5     start trial work at 9:00 a.m.

6               Before you go, remember, do not talk about or

7     communicate with anybody about your impressions of the case or

8     of the evidence.  Do not view, read or hear reports, comments

9     or articles about the case.  Do not conduct any research about

10    the case, the matters in the case or the individuals involved

11    in the case.

12              Keep an open mind until you've heard and seen all

13    evidence and heard my instructions and you've gone to the jury

14    room to deliberate and all of you have discussed all evidence

15    amongst yourselves.  That's how a verdict is reached.

16              With this, thank you again for your patience, for

17    having been here since this morning.  And I look forward to

18    seeing you all tomorrow at 9:00 a.m.

19         (Whereupon the following proceedings were had in open court

20         without the presence of the jury.)

21              THE COURT:  Ms. Ortiz, we are going to adjourn for

22    the day.  You need to be here tomorrow to finalize your

23    testimony.

24              Do you understand?

25              THE WITNESS:  I understand.

```
1                    THE COURT:  Do not talk about this case, specifically
2       your testimony, with anybody.
3                    Do you understand?
4                    THE WITNESS:  I do.
5                    THE COURT:  Do not review documents related to this
6       case.
7                    Do you understand?
8                    THE WITNESS:  I do.
9                    THE COURT:  Otherwise, you are free to interact with
10      members of the prosecution team or other individuals.  I do not
11      have any problems with that, just so long as you stay within
12      the boundaries I've explained to you.
13                   Do you understand?
14                   THE WITNESS:  I do.
15                   THE COURT:  Thank you.  You may step down now, ma'am.
16           (Witness excused.)
17                   THE COURT:  Okay.  With this, we will adjourn until
18      tomorrow at 9:00 a.m.  Counsel should remember that we will
19      have a housekeeping session around 8:40, 8:45 in the morning
20      with respect to the point we discussed at sidebar.
21                   Any questions?
22                   MR. GONZALEZ-DELGADO:  No, Your Honor.
23                   THE COURT:  All right.  The Court adjourns until
24      tomorrow at 9:00 a.m.
25           (Whereupon the evening recess was taken at 5:21 p.m.)
```

```
 1    UNITED STATES DISTRICT COURT )
                                   )  ss.
 2    DISTRICT OF PUERTO RICO      )

 3

 4                        REPORTER'S CERTIFICATE

 5

 6              I, CINDY LEE BROWN, RPR, Federal Official Court

 7    Reporter for the United States District Court for the District

 8    of Puerto Rico, appointed pursuant to the provisions of Title

 9    28, United States Code, Section 753, do hereby certify that the

10    foregoing is a true and correct computer-aided transcript of

11    proceedings had in the within-entitled and numbered cause on

12    the date herein set forth; and I do further certify that the

13    foregoing transcript has been prepared by me or under my

14    direction.

15

16              Dated this 21st day of June, 2023.

17

18

19                              /s/ Cindy Lee Brown
                                _____
20                              CINDY LEE BROWN, RPR, Federal
                                Official Court Reporter
21                              150 Carlos Chardon, Room 150
                                San Juan, PR  00918
22                              (787) 772-3478

23

24

25
```